**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| **IN RE:** | ) | **CHAPTER 11** |
| | ) | |
| **P-D VALMIERA GLASS USA CORP.,** | ) | **CASE NO. 19-59440-pwb** |
| | ) | |
| | ) | |
| **Debtor.** | ) | |

_____

**DISCLOSURE STATEMENT
TO ACCOMPANY PLAN OF LIQUIDATION**

_____

**SCROGGINS & WILLIAMSON, P.C.**

**J. Robert Williamson
Georgia Bar No. 765214
Ashley Reynolds Ray
Georgia Bar No. 601559
One Riverside
4401 Northside Parkway
Suite 450
Atlanta, GA 30327
(404) 893-3880**

**Counsel for the Debtor**

**Dated: September 10, 2020**

## ARTICLE I
## INTRODUCTION

This Disclosure Statement (the "**Disclosure Statement**") is filed in accordance with Section 1125 of Title 11, United States Code (as amended and supplemented, the "**Bankruptcy Code**"), by P-D Valmiera Glass USA Corp. (the "**Debtor**"), debtor and debtor-in-possession in the above-styled, Chapter 11 case (the "**Case**"), to provide information to all known creditors and equity interest holders about the Plan of Liquidation filed on September 10, 2020 (as it may be amended from time to time, the "**Plan**," a copy of which is attached hereto as Exhibit 1. The purpose of the Disclosure Statement is to provide information of a kind and in detail sufficient to enable Creditors and Interest Holders in certain impaired Classes to make an informed judgment regarding whether to accept or reject the Plan and to inform Holders of Claims and Interests in the unimpaired Classes of their treatment under the Plan. The information contained in this Disclosure Statement is provided by the Debtor. The Debtor urges parties in interest to read this Disclosure Statement and the Plan carefully prior to casting votes for or against the Plan.

Unless otherwise defined herein, capitalized terms used herein shall have the same meaning ascribed to them in the Plan.

### 1.1     Disclaimer

**ALL CREDITORS AND INTEREST HOLDERS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, THE EXHIBITS AND THE DISCLOSURE STATEMENT AS A WHOLE.**

**THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, STATUTORY PROVISIONS, DOCUMENTS RELATED TO THE PLAN, EVENTS IN THE DEBTOR'S CHAPTER 11 CASE, AND FINANCIAL INFORMATION. ALTHOUGH THE DEBTOR BELIEVES THAT THE PLAN AND RELATED DOCUMENT SUMMARIES ARE FAIR AND ACCURATE, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTOR'S MANAGEMENT, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. FOR THE FOREGOING REASONS, AS WELL AS THE COMPLEXITY OF THE DEBTOR'S FINANCIAL MATTERS, THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT ANY INACCURACY OR OMISSION. THE FINANCIAL DATA SET FORTH HEREIN, EXCEPT AS OTHERWISE SPECIFICALLY NOTED, HAS NOT BEEN SUBJECTED TO AN INDEPENDENT AUDIT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF. NO ASSURANCES EXIST THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME HEREAFTER.**

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN, AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.   NO REPRESENTATIONS CONCERNING THE DEBTOR ARE AUTHORIZED BY THE DEBTOR OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.    ANY OTHER REPRESENTATIONS OR INDUCEMENTS MADE TO SOLICIT YOUR ACCEPTANCE THAT ARE NOT CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION TO ACCEPT OR REJECT THE PLAN.   FURTHERMORE, SUCH OTHER REPRESENTATIONS OR INDUCEMENTS SHOULD BE IMMEDIATELY REPORTED TO COUNSEL FOR THE DEBTOR.  COUNSEL FOR THE DEBTOR MAY, IN TURN, COMMUNICATE SUCH INFORMATION TO THE BANKRUPTCY COURT FOR APPROPRIATE ACTION.

WITH RESPECT TO ADVERSARY PROCEEDINGS, CONTESTED MATTERS, OR OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE, OR BE CONSTRUED AS, AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER.  INSTEAD, THIS DISCLOSURE STATEMENT SHALL CONSTITUTE STATEMENTS MADE IN CONNECTION WITH SETTLEMENT NEGOTIATIONS.

THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NONBANKRUPTCY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY.   FURTHERMORE, THIS DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE LEGAL EFFECTS, INCLUDING, BUT NOT LIMITED TO, THE TAX EFFECTS, OF THE PROPOSED PLAN.  YOU SHOULD CONSULT YOUR LEGAL OR TAX ADVISOR ON ANY QUESTIONS OR CONCERNS REGARDING THE TAX OR OTHER LEGAL CONSEQUENCES OF THE PLAN.

MUCH OF THE INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED AND WAS DERIVED FROM THE DEBTOR'S BOOKS AND RECORDS, WHICH ARE DEPENDENT UPON INTERNAL ACCOUNTING METHODS.  AS A RESULT, VALUATIONS OF ASSETS AND CLAIM LIABILITIES ARE ESTIMATED. ALTHOUGH SUBSTANTIAL EFFORT HAS BEEN MADE TO BE COMPLETE AND ACCURATE, THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THE FULL AND COMPLETE ACCURACY OF THE INFORMATION CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE U.S. SECURITIES AND EXCHANGE COMMISSION NOR HAS THE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

## 1.2    Disclosure Statement

This Disclosure Statement sets forth certain information regarding the Debtor's pre-petition activity.  This Disclosure Statement also describes the Plan, alternatives to the Plan, effects

of confirmation of the Plan, and the manner in which distributions will be made under the Plan. In addition, the Disclosure Statement discusses the confirmation process and voting procedures that Holders of Claims in impaired Classes must follow for their votes to be counted.

**WHEN AND IF CONFIRMED BY THE BANKRUPTCY COURT, THE PLAN WILL BIND THE DEBTOR AND ALL HOLDERS OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTOR, WHETHER OR NOT THEY ARE ENTITLED TO VOTE OR DID VOTE ON THE PLAN AND WHETHER OR NOT THEY RECEIVE OR RETAIN ANY DISTRIBUTIONS OR PROPERTY UNDER THE PLAN. THUS, ALL CLAIMANTS AND INTEREST HOLDERS ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT CAREFULLY. IN PARTICULAR, HOLDERS OF IMPAIRED CLAIMS WHO ARE ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT, THE PLAN, AND ANY EXHIBITS TO THE PLAN OR DISCLOSURE STATEMENT, CAREFULLY AND IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.**

### 1.3    Summary of Distributions Under the Plan

The chart below summarizes the treatment, timing and percentage distributions to each Class under the Plan. For a further discussion, see Article IV below.

| Class No. | Claim/Interest | Treatment of Claim/Interest | Estimated Amount and Projected Recovery | Voting Rights |
|---|---|---|---|---|
| N/A | Administrative Expense Claims | Except as otherwise provided in the Plan, each holder of an Allowed Administrative Expense Claim will be paid in full and in Cash from the Plan Funding Reserve, without interest, on or as soon as practicable after the later of (a) thirty (30) days following the Final Administrative Expense Claim Bar Date; (b) ten (10) business days following the date of entry of a Final Order allowing the Claim; or (c) as the holder may otherwise agree. | Estimated Amount: $1,606,247.97 <br><br> Estimated Recovery: 100% of Allowed Amount | Unimpaired and not entitled to vote |
| N/A | Priority Tax Claims | Each holder of an Allowed Priority Tax Claim, will be paid in Cash in full from | Estimated Amount: $417,308.70 | Unimpaired and not |

| Class No. | Claim/Interest | Treatment of Claim/Interest | Estimated Amount and Projected Recovery | Voting Rights |
|---|---|---|---|---|
| | | the Plan Funding Reserve on the Effective Date or as soon thereafter as is reasonably practicable, but in no event later than the end of five (5) years from the Petition Date through regular quarterly installments in Cash through and including the date such Allowed Priority Tax Claim is paid in full. If paid over time, the Holder shall receive interest at the Section 6621 Interest Rate (or the applicable statutory rate under state law). | Estimated Recovery: 100% of Allowed Amount | entitled to vote |
| 1 | Other Priority Claims | Each holder of an Allowed Priority Claim, will be paid in full and in Cash, without interest, on or as soon as practicable after the later of (a) the Effective Date, or (b) the date after such Claim is Allowed; or (c) as the holder may otherwise agree. | Estimated Amount: $ 0.00  Estimated Recovery: 100% of Allowed Amount | Unimpaired and not entitled to vote |
| 2 | Other Secured Claims | Each Allowed Secured Claim in Class 2 shall be satisfied, at the Debtor's option, as follows (i) by the transfer, assignment and conveyance by the Debtor of the collateral securing such Class 2 Claim to the Holder of such Allowed Secured Claim in full and final satisfaction of such Allowed Secured Claim, (ii) by the sale of the collateral securing such | Estimated Amount: $ 0.00  Estimated Recovery: 100% of Allowed Secured Claim | Unimpaired and not entitled to vote |

| Class No. | Claim/Interest | Treatment of Claim/Interest | Estimated Amount and Projected Recovery | Voting Rights |
|---|---|---|---|---|
| | | Allowed Secured Claim, following Designated Notice, and the payment by the Debtor to the Holder of such Allowed Secured Claim the net sale proceeds in an amount equal to the value of such Holder's interest in the collateral in full and final satisfaction of such Allowed Secured Claim, or (iii) by payment of Cash to the Holder of such Allowed Secured Claim in an amount equal to the value of such holder's interest in the collateral securing the Allowed Secured Claim. | | |
| 3 | Prepetition Bank Claim | On the Effective Date, the Holder of the Prepetition Bank Claim shall receive all of the Estate Assets and their proceeds except for the Liquidating Trust Assets and the Plan Funding Reserve.  After the Effective Date, the Bank shall receive any portion of the Plan Funding Reserve not used to satisfy Confirmation Expenses or Post-Effective Date Debtor Expenses (to the extent permitted under the Plan). The Allowed amount of the Prepetition Bank Claim shall be $102,949,851.95 and the Bank shall waive any diminution claim and any deficiency claim | Estimated Amount: $102,949,851.95

Estimated Recovery: 14.1% | Impaired and entitled to vote |

| Class No. | Claim/Interest | Treatment of Claim/Interest | Estimated Amount and Projected Recovery | Voting Rights |
|---|---|---|---|---|
| | | against the Debtor and its Estate. | | |
| 4 | Claims of WARN Act Settlement Class, except WARN GUC Claim | The Claims of the WARN Act Settlement Class shall be treated as provided in the WARN Act Class Settlement.<br><br>(a) **WARN Claim.** No later than ten (10) days following the Effective Date the Debtor shall make payment on account of the WARN Claim from the Plan Funding Reserve to the WARN Act Settlement Administrator in the amount of $887,500 (which amount shall be inclusive of any withholding and FICA taxes payable by the employer and employees), which, in addition to the WARN Net Recovery shall be in full satisfaction of the WARN Claim. The WARN Act Settlement Administrator shall make further distribution and payment of said funds in accordance with the WARN Act Class Settlement.<br><br>(b) **WARN Net Recovery**. The Liquidating Trustee shall pay any WARN Net Recovery to the WARN Act Settlement Administrator in accordance with the WARN Act Class Settlement. The WARN Act Settlement Administrator shall make | Estimated Amount: $887,500, plus WARN Net Recovery<br><br>Estimated Recovery: 100% (less expenses as provided in WARN Act Class Settlement) | Impaired and entitled to vote |

| Class No. | Claim/Interest | Treatment of Claim/Interest | Estimated Amount and Projected Recovery | Voting Rights |
|---|---|---|---|---|
| | | further distributions and payment of said funds in accordance with the WARN Act Class Settlement. | | |
| 5 | Unsecured Claims, including the WARN GUC Claim | Holders of Allowed Class 5 Claims shall receive one or more pro rata distributions of the Liquidation Proceeds less the Retained Proceeds. The WARN Act Settlement Administrator shall make further distributions and payment of any funds received on account of the WARN GUC Claim in accordance with the WARN Act Class Settlement. | Estimated Amount: $23 to $34 million<br><br>Estimated Recovery: 4.2 to 6.1% | Impaired and entitled to vote |
| 6 | Insider Claims | As of the Effective Date, all Class 6 Insider Claims which are not Objecting Insider Claims shall be disallowed; however, in lieu of disallowance, each Holder of a Class 6 Claim may elect to convert its Claim into equity in the Post-Effective Debtor in accordance with Section 5.08. | Estimated Amount: $120 to $125 million<br><br>Estimated Recovery: 0% | Impaired and entitled to vote |
| 7 | Allowed Equity Interests | Holders of Allowed Equity Interests in Class 7 shall retain their Equity Interests in the Post-Effective Date Debtor and shall receive no distributions of Cash or other Property under the Plan or from the Liquidating Trust on account of such Equity Interests. | Estimated Recovery: $0.00 | Impaired and entitled to vote |

The liability estimates outlined in the above chart are estimates only, and may change as objections are filed and resolved. The projected Administrative Expense Claims include estimated professional fees to be incurred by the Debtor or the Official Committee of Unsecured Creditors (the "**Committee**") through a projected Effective Date of December 4, 2020, but do not reflect the professional fees already paid to date. It is assumed that a substantial portion of the professional fees and expenses to be incurred in the future will be paid on a monthly basis under the interim compensation arrangement approved previously in the Cases, subject to final review and approval by the Bankruptcy Court. Estimated distributions do not take into account any proceeds resulting from successful pursuit of Causes of Action following the Effective Date. Such additional recoveries may increase the estimated distributions for Class 5.

### 1.4    Background

On June 17, 2019 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Georgia, Atlanta Division (the "**Bankruptcy Court**"). Upon filing for Chapter 11 protection, the Debtor became a "Debtor-in-Possession" under the Bankruptcy Code and has acted in that capacity since that time.

The Debtor filed simultaneously with this Disclosure Statement its Plan of Liquidation. The Debtor, as proponent of the Plan, distributes this Disclosure Statement together with the Plan in order to solicit acceptances of the Plan. This introductory section is qualified in its entirety by the detailed explanations that follow and the provisions of the Plan. In the event of conflict between anything stated in this Disclosure Statement and the Plan, the terms of the Plan will control.

### 1.5    Solicitation of Acceptances

Pursuant to a Court Order dated [_____], 2020, creditors and interest holders may accept or reject the Plan no later than [_____], **2020** (the "**Voting Deadline**"). A ballot with which to indicate and file an acceptance or rejection of the Plan has been provided to you. You must complete and file your ballot on or before the Voting Deadline in order for your vote to count. Any ballot that is executed by the holder of any Allowed Claim but does not indicate acceptance or rejection of the Plan shall be deemed to have accepted the Plan. Any other ballot not filed in accordance with the filing instructions on the ballot pertaining to the Plan shall not be counted for voting purposes.

*THE DEBTOR, AS PLAN PROPONENT, HEREBY SOLICITS APPROVAL OF THE PLAN BY ITS CREDITORS AND INTEREST HOLDERS. THE DEBTOR BELIEVES THE PLAN PROVIDES THE OPTIMUM RETURN TO CREDITORS AND THAT LIQUIDATION UNDER CHAPTER 7 OF THE BANKRUPTCY CODE WOULD RESULT IN A REDUCED DISTRIBUTION TO UNSECURED CREDITORS. THE DEBTOR URGES EACH CREDITOR AND INTEREST HOLDER TO VOTE IN FAVOR OF THE PLAN BY MARKING THE "ACCEPTS" BOX ON THE ENCLOSED BALLOT AND FILING IT WITH THE KCC, LLC, THE DEBTOR'S CLAIMS AND NOTICING AGENT, ON OR BEFORE THE VOTING DEADLINE. THE CREDITORS COMMITTEE HAS INFORMED THE DEBTOR THAT IT SUPPORTS THE PLAN AND URGES CREDITORS TO VOTE IN FAVOR OF THE PLAN.*

## ARTICLE II
## HISTORY OF THE DEBTORS AND EVENTS LEADING UP TO CHAPTER 11

**2.1    History of the Debtor**

> **(a)    <u>The Debtor's Business Operations</u>**

The Debtor is a Georgia corporation and a member of Valmiera Glass Group.  Valmiera Glass Group is comprised of (i) Valmieras Stikla Šķiedra, AS ("**VSS**")[1], the Debtor's Latvian parent company, (ii) Valmiera Glass UK Ltd., a sister company to the Debtor, and (iii) P-D Valmiera Glass USA Corp. Collectively, the Valmiera Glass Group produces and processes fiberglass products which are used for a variety of end use applications from building and construction to composites to thermal insulation as well as applications in aviation, architecture and the sports and leisure industry.

VSS is based in Central Europe and has over a half a century of experience in the production and processing of fiberglass.  VSS has customers worldwide with North America being its second largest market behind Europe.  In 2014, VSS decided to invest in a production facility in the United States in an effort to further increase its market share in North America. The Debtor was formed as a subsidiary of VSS and the Debtor's location in Dublin, Georgia was selected as the site from which its operations would run.  The Debtor's initial operations, known as  "Phase I," included a needle mat punch line, which became operational in 2015.  After operating Phase I profitably for several years, the Debtor looked to expand its operations to include a melting furnace in addition to the downstream processing facility.  In 2017, the Debtor launched "Phase II" of its operations and built a fiberglass furnace for the production of glass fibre.  After delays in the construction of Phase II, it became operational in early 2018.

> **(b)    <u>The Debtor's Pre-Petition Capital Structure</u>**

> > **(i)    <u>City of Dublin and County of Laurens Development Authority</u>**.

In order to finance the acquisition of real property and construction of its facility, the Debtor entered into a bond for title transaction with the City of Dublin and County of Laurens Development Authority (the "**Authority**").  Initially, the Authority issued a Taxable Industrial Development Revenue Bond (Valmiera Glass USA Corp. Project), Series 2014 in the maximum principal amount of $129,000,000 (the "**Series 2014 Bond**"), to acquire a building or buildings, related improvements, building fixtures and building equipment to be constructed and installed on land located within the County and owned by the Authority, and equipment and other personal property to be installed therein, which was to be leased by the Authority to the Debtor, for use by the Debtor as (i) a facility for light assembly and for warehousing the Debtor's imported fiberglass products ("**Phase I**") and (ii) if undertaken by the Debtor, a manufacturing expansion of Phase I ("**Phase II**").

In 2016, and in connection with the Debtor's decision to proceed with Phase II, the Debtor entered into a second bond for title transaction with the Authority.  The second bond for title

---

[1] VSS is a publicly traded Latvian company which holds a 52% interest in the Debtor.  On June 17, 2019, VSS filed a Legal Protection Proceeding in Latvia in order to negotiate a restructuring agreement with its creditors.

transaction involved the issuance of a new bond which was to be used to (i) retire and refund the outstanding principal amount of the Series 2014 Bond, and thereby refinance Phase I of the Project, (ii) to acquire Phase II of the Project, and (iii) to lease both Phase I and Phase II to the Debtor pursuant to a lease agreement which superseded and replaced the lease agreement in place as part of the 2014 transaction.

The lease structure was implemented to allow the Debtor certain real and personal property tax abatements; however, the taxing authorities were unwilling to lose all of the otherwise payable tax revenue during the term of the Lease so the Debtor and the Authority entered into an Economic Development Agreement dated April 1, 2016 pursuant to which the Debtor agreed to make certain payments under the Lease. Additionally, the Lease provided terms for repayment or forgiveness of certain loans, grants and other advances made to the Debtor as an incentive for the Debtor to build its facility in Dublin, Georgia. More specifically, the Authority made two loans to the Debtor from a Revolving Loan Fund established by Laurens County. The first loan, in the principal amount of $375,000 was made to Debtor for Phase I (the "**Phase I Community Revolving Loan"**). The second loan in the principal amount of $1,600,000 was made to Debtor for Phase II (the "**Phase II Community Revolving Loan**"). The Authority contends that repayment of both loans are obligations under the Lease. The Authority also granted the Debtor $600,000 (the "**Phase I Community Grant Payment**") and $1,000,000 (the "**Phase II Community Grant Payment**"), which under the Lease structure are subject to possible recovery payments if certain established milestones were not met or in the event of a plant shutdown.

In addition to the loans and grants by the Authority, the Debtor also received two Georgia EDGE Grants from the State of Georgia. The first grant was in the amount of $300,000 for Phase I and the second was in the amount of $1,000,000 for Phase II.

In connection with the 2016 Lease, the Debtor and the Authority entered into an Option Agreement dated April 1, 2016 pursuant to which the Debtor was granted the option to purchase all of the real and personal property subject to the Lease on terms and conditions set forth in the Option Agreement. On June 2, 2020, the Debtor exercised its option pursuant to the Option Agreement, with the consent of the Authority, and as part of an approved sale of assets to Saint-Gobain Adfors America, Inc., which is discussed in more detail below.

### (ii)    AS "SEB Banka" and Danske Bank A/S.

As of the Petition Date, the Debtor was indebted to the Bank under a Guaranty and Security Agreement dated as of June 28, 2017 for loans to the Debtor's parent company, VSS, in the amount of $102,949,851.95 (the "**Pre-Petition Debt**"). Furthermore, as security for the payment of the Pre-Petition Debt, the Debtor granted to the Bank pursuant to the Guaranty and Security Agreement and related documents (collectively, the "**Pre-Petition Loan Documents**"), security interests in and liens (collectively, the "**Pre-Petition Liens**") upon all of the Debtor's interests in real and personal property, including, without limitation, the following items: (i) accounts, accounts receivables, payment intangibles, instruments, intercompany claims, and other rights to receive payments of the Debtor (including, without limitation, the accounts), whether now existing or hereafter arising or acquired, (ii) related general intangibles (including, without limitation, contract rights and intellectual property), chattel paper, documents, supporting obligations, letter-of-credit rights, commercial tort claims set forth in schedules to the Guaranty and Security

Agreement, remedies, guarantees and collateral evidencing, securing or otherwise relating to or associated with the property in subpart (i) above, including, without limitation, all rights of enforcement and collection, (iii) all goods (including all inventory, all equipment, all motor vehicles and all fixtures), (iv) books and records of the Debtor evidencing or relating to or associated with any of the foregoing, and (iv) collections, accessions, receipts and all proceeds of any and all of the foregoing (all such property, as the same existed on the Petition Date, together with all cash and non-cash proceeds thereof, the "**Pre-Petition Collateral**").

       **(c)**   **The Debtor's Ownership Structure**

As of the Petition Date, the Debtor's ownership structure was as follows:

| | |
|---|---|
| AS Valmieras Stikla Šķiedra | 52% |
| Mr. Heinz-Jürgen Preiss-Daimler | 15% |
| P-D Management Industries Technologies Gmbh | 23% |
| Lamtec Corporation | 10% |

**2.2**     **Events Leading Up To Chapter 11**

The Debtor incurred significant unexpected losses as a result of construction delays and an overrun of construction costs for its Phase II operations. The construction completion was followed by an extended production start-up during which the Debtor did not manage to achieve the planned and designed capacity. As a result, Phase II proved to be unprofitable from the start and a cash drain on the remaining portion of the Debtor's business. The Debtor sought to sell its operations pre-petition, but was not able to find a suitable buyer within the timeframe needed. The continuous financial support from the major shareholder VSS led to cash flow constraints at VSS.

By June 2019, VSS was preparing to file a Legal Protection Proceeding in Latvia in order to negotiate a restructuring agreement with its creditors. The Debtor was a co-obligor and/or guarantor on certain of VSS's debt; therefore, after consultation with its professionals, the Debtor determined that filing Chapter 11 was the best method of preserving the value of its assets. Shortly before its Chapter 11 filing on June 17, 2019, the Debtor began shutting down the Phase II operations and terminated a significant portion of its workforce. Immediately after filing, the Debtor sought and obtained approval from the Court to execute a controlled shut down and cooling of the furnace in an effort to maximize and preserve the value for the benefit of the estate.

**2.3**     **Significant Events During Chapter 11**

       **(a)**   **The Debtor's Postpetition Financial Performance**

Since the Petition Date, the Debtor has operated its busines as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. Summaries of the Debtor's post-petition financial performance are filed on a monthly basis with the Bankruptcy Court pursuant to the Operating Guidelines and Reporting Requirements for Debtors In Possession and Chapter 11 Trustees for Region 21 (the "**Monthly Operating Reports**"). The Monthly Operating Reports are available from the Office of the Clerk of the U.S. Bankruptcy Court for the Northern District of Georgia and are also available at no charge online at www.kccllc.net/ValmieraGlassUSA.

**(b)  First Day Orders**

On June 19, 2019, the Court held a hearing on certain "First Day" motions, in which the Debtor sought entry of orders providing certain relief on an expedited basis in order to minimize disruption to the Debtor's business operations and facilitate an orderly reorganization process. Following the conclusion of that hearing, the Bankruptcy Court entered orders on the "First Day" motions, including, without limitation, (i) an order authorizing the Debtors to pay accrued but unpaid prepetition wages earned by its employees, and  (ii) an order authorizing the use of funds for an orderly plant closure.

**(c)  The Debtor's Professionals**

The Debtor retained the Atlanta-based firm of Scroggins & Williamson, P.C. as its general bankruptcy counsel.  Scroggins & Williamson, P.C. has extensive experience representing debtors in complex Chapter 11 bankruptcy cases.  The Debtor also retained KCC, LLC as its claims, noticing and balloting agent.

**(d)  Formation of Creditors Committee**

On July 8, 2019, the U.S. Trustee pursuant to its authority under Section 1102 of the Bankruptcy Code appointed the following members to the Official Committee of Unsecured Creditors (the "**Committee**"):  (i) Etimine USA, Inc., (ii) Active Minerals International, LLC, and (iii) DeWayne Whitehead, on behalf of himself and all others similarly situated.   The Committee retained the law firm of Kilpatrick Townsend & Stockton, LLP as counsel.  In addition, the Committee retained Dundon Advisers LLC as financial advisors to the Committee.

**(e)  Post-Petition Cash Collateral Use**

 On June 25, 2019, the Debtor filed its Motion for Authority to Use Cash Collateral [Dkt. No. 26] seeking authority to use cash collateral to fund its ongoing operations.  On July 2, 2019, the Court entered an Interim Order on Debtor's Motion for Authority to Use Cash Collateral and Notice of Final Hearing [Dkt. No. 48], (the "**First Interim DIP Order**").  On July 17, 2019, the Court entered a Second Interim Order on Debtor's Motion for Authority to Use Cash Collateral and Notice of Final Hearing [Dkt. No. 75] (the "**Second Interim DIP Order**").  On August 9, 2019, the Court entered a Third Interim Order on Debtor's Motion for Authority to Use Cash Collateral and Notice of Final Hearing [Dkt. No. 125], (the "**Third Interim DIP Order**") and on September 19, 2019, the Court entered a Final Order on Debtor's Motion for Authority to Use Cash Collateral [Dkt. No. 194] (the "**Final DIP Order**" and together with the First Interim DIP Order, the Second Interim DIP Order and the Third Interim DIP Order, the "**Orders**").  Pursuant to Paragraph 1(a) of the Final DIP Order, the Termination Date may be extended by written agreement of the Debtor and the Bank with the consent of the Committee.  On or about December 30, 2019, the Debtor, the Bank and the Committee signed a written Stipulation extending the Termination Date through March 23, 2020.  On March 24, 2020, the Court entered an Order Approving Stipulation Between Debtor and Bank Extending Use of Cash Collateral [Dkt. No. 299], extending the Termination Date through April 28, 2020.  On April 29, 2020, the Debtor, the Bank and the Committee signed a written Stipulation extending the Termination Date through June 21, 2020.  On August 24, 2020, the Court entered an Order Approving Stipulation Authorizing

Further Use of Cash Collateral pursuant to which the Debtor's authority to use cash collateral was extended through and including December 31, 2020 and certain provisions of the Final Cash Collateral Order pertaining to a Carve-Out for professional fees was modified.

Paragraph 10 of the Final Order established December 3, 2019 (the "**Challenge Deadline**") as the deadline for the Committee to challenge the amount, validity, perfection, enforceability, priority or extent of the pre-petition debt and/or liens asserted by the Bank. By written agreement, the Committee and Bank agreed to extend the Challenge deadline through and including January 17, 2020.

On January 17, 2020, the Committee filed its Motion of the Official Committee of Unsecured Creditors for Order Granting (I) Leave, Standing, and Authority to Commence and Prosecute Certain Claims on Behalf of the Debtor's Estate Against (A) AS "SEB BANKA," in its Capacity as Security Agent, and (B) AS "SEB BANKA" and DANSKE BANK A/S, in Their Respective Capacities as Lenders, and (ii) Related Relief [Dkt. No. 252] (the "**Standing Motion**"). On April 16, 2020, the Bank filed its Objection to the Motion of the Official Committee of Unsecured Creditors for Order Granting (II) Leave, Standing, and Authority to Commence and Prosecute Certain Claims on Behalf of the Debtor's Estate, and (ii) Related Relief [Dkt. No. 317] (the "**Bank Objection**"). In support of its objection, the Bank also filed a Declaration Emils Zalitis [Dkt. No. 318]. On April 17, 2020, the Debtor filed a response to the Standing Motion [Dkt. No. 320]. No other creditor or party in interest filed a challenge to the pre-petition debt or liens asserted by the Bank on or before the Challenge Deadline. The Standing Motion, the Bank Objection, and the Debtor's response remain pending.

### (f)    Schedules and Statement of Financial Affairs

On July 23, 2019, the Debtor filed with the Court its schedules and statements required by Bankruptcy Rule 1007 (the "**Schedules**"). These Schedules provide information concerning the Debtor's financial condition on or about the Petition Date. These documents are available from the Office of the Clerk of the U.S. Bankruptcy Court for the Northern District of Georgia and are online at https://ecf.ganb.uscourts.gov (please note that a PACER account is required to view and download documents), or free of charge at www.kccllc.net/ValmieraGlassUSA.

### (g)    Bar Dates

By Order of the Bankruptcy Court dated January 10, 2020, the Court established March 11, 2020 as the Bar Date by which all creditors holding prepetition claims (including administrative expense claims under 11 U.S.C. § 503(b)(9) for goods delivered within 20 days prior to the Petition Date) were required to file proofs of claim or be barred from (i) asserting any claim against the Debtor, and (ii) voting on, or receiving distributions under, the Plan. Creditors whose claims were listed in the Schedules and not identified as "contingent," "disputed" or "unliquidated" were not required to file proofs of claim.

By Order of the Court dated August 13, 2020, the Court established September 15, 2020 as the Initial Administrative Expense Claim Bar Date by which all creditors asserting a claim arising after the Petition Date and through and including July 31, 2020 was required to file a request for payment or be barred from asserting such claim.

**(h)    Sale to Saint-Gobain Adfors America, Inc.**

On March 2, 2020, the Debtor filed its *Debtor's Motion (A) For Authority to Sell Assets Free and Clear of Liens, Claims and Encumbrances; (B) to Assume and Assign Certain Executory Contracts, Leases, and Licenses and Establish Cure Costs in Connection Therewith; (C) to Establish Procedures with Respect to Such Sale and the Assumption and Assignment of Executory Contracts and Leases, (D) to Consider Approval of Breakup Fee, And (E) To Shorten and Limit Notice* [Dkt. No. 273]. On March 2, 2020, the Court held a preliminary hearing on the Sale Motion. On March 10, 2020, the Court entered an order approving certain procedures in connection with the sale of substantially all of the Debtor's assets [Dkt. No. 280].

The Debtor entered into an asset purchase agreement dated March 2, 2020 with Saint-Gobain Adfors America, Inc. ("**Saint Gobain**") for the purchase and sale of substantially all of the Debtor's assets. On April 22, 2020, the Court held a hearing on the Sale Motion and approved the asset purchase agreement and the sale transaction to Saint-Gobains. On April 27, 2020, the Court entered an *Order (I) Approving Asset Purchase Agreement And Authorizing the Sale of the Debtor's Assets Outside the Ordinary Course of Business, (II) Authorizing the Sale of Assets Free And Clear of All Liens, Claims, Encumbrances And Interests, (III) Authorizing the Assumption And Assignment Of Assumed and Assigned Agreements, And (IV) Granting Related Relief* granting the Sale Motion [Dkt. No. 325] (the "**Sale Order**"). The transaction authorized by the Sale Order was closed effective as of 12:01 a.m. on June 2, 2020.

Pursuant to the terms of the Sale Order, the Debtor exercised the purchase option under the Lease with the Authority and paid the Authority $1.1 million of the sale proceeds in connection therewith. The remaining sale proceeds in the amount of $17,284,026.52 are being held by Truist Bank, as escrow agent.

**(i)    WARN Act Litigation**

As mentioned above, the Debtor incurred significant unexpected losses as a result of construction delays and an extended start-up of its Phase II operations. Phase II proved to be unprofitable from the start and a cash drain on the remaining portion of the Debtor's business. The Debtor was in negotiations with a potential buyer to sell substantially all of its business and believed a sale transaction that would keep the workforce intact was imminent. When the Debtor determined that a sale was not possible within the timeframe needed, the Debtor began shutting down the Phase II operations, terminated a significant portion of its workforce and sought protection under Chapter 11 of the Bankruptcy Code.

A former employee, Dwayne Whitehead, commenced the WARN Act Class Action, Adversary Proceeding No. 19-05247, pursuant to the Worker Adjustment and Retraining Notification, or "WARN," Act, 29 U.S.C. § 2101 et seq in the Bankruptcy Court on June 26, 2019, in which he asserted priority claims against the Debtor under the WARN Act. Whitehead alleged that the mass layoff and/or plant closing implemented at the Facility, beginning on or about June 17, 2019, violated the WARN Act because the putative class members who worked at or reported to the facility owned and operated by the Debtor were not provided sixty days advance written notice of their terminations, and sought an aggregate allowed § 507(a)(4) and (5) claim against the Debtor on behalf of himself and on behalf of all other persons similarly situated, (the "**Class**

Members") equal to the sum of 60 days' unpaid wages, salary, commissions, bonuses, accrued holiday pay, accrued vacation pay, pension and 401(k) contributions and other ERISA benefits, determined in accordance with the WARN Act, with any remainder as a general unsecured claim, plus attorneys' fees and costs. On July 25, 2019, the Parties filed the first of multiple stipulations extending the time for the Debtor to file an answer, in an effort to conserve the already scarce assets of the estate and to explore the possibility of a consensual resolution. On March 9, 2020, Whitehead and Mark Hooper filed a class proof of claim for WARN damages, unpaid wages and vacation (the "**WARN Act Class POC**").

While the Debtor has consistently maintained that it has strong defenses and/or objections to liability and damages with respect to both the WARN Act Class Action and the WARN Act Class POC, the Debtor has also recognized that litigating these issues would undoubtedly be time consuming and costly to the Debtor's Estate. In order to facilitate a possible settlement, the Debtor informally produced wage and employment information for use in settlement negotiations. Eventually, with the active participation and assistance of the Committee and the Bank, the parties were able to reach a consensual resolution. The WARN Act Class Settlement is incorporated in the Plan and has been preliminarily approved by order of the Bankruptcy Court entered in the Case on _____, 2020 [Doc. No. __] (the "**Preliminary Approval Order**"). The Preliminary Approval Order, *inter alia*, (a) preliminarily approves the WARN Act Class Settlement pursuant to Bankruptcy Rule 7023 and Civil Rule 23A, (b) certifies the WARN Act Settlement Class for settlement purposes only, including the appointment of The Gardner Firm, P.C. and Lankenau & Miller, LLP as Class Counsel and Whitehead and Hooper as Class Representatives, (c) approves the form and manner of notice of the WARN Act Class Settlement to the members of the Class, and (d) schedules a fairness hearing to consider final approval of the WARN Act Class Settlement (the "**Fairness Hearing**"). The Fairness Hearing has been scheduled before the Bankruptcy Court for _____, 2020. If approved by the Bankruptcy Court, the WARN Act Class Settlement would resolve the WARN Act Class POC and WARN Act Class Action.

Among other things, the WARN Act Class Settlement would provide for certain allowed Claims in favor of the WARN Act Settlement Class, including the WARN Claim, the WARN Net Recovery and the WARN GUC Claim. The WARN Claim would be allowed as a Claim entitled to priority under section 507(a)(4) of the Bankruptcy Code in the amount of $887,500 (which amount shall be inclusive of any withholding and FICA taxes payable by the employer and employees). Additionally, the WARN Act Settlement Class would receive the WARN Net Recovery, consisting of 15% of any recoveries by the Liquidating Trust from any Excluded Assets, net of legal fees and other costs incurred by the Liquidating Trust directly related to such recoveries. The treatment under the Plan afforded the WARN Claim and the WARN Net Recovery is described in Section 4.3(b) below.

Finally, the WARN Act Settlement Class would also be allowed the WARN GUC Claim, which is an Unsecured Claim in the in the amount of $1,112,500. The WARN GUC Claim is included in Class 5 under the Plan. The treatment of Class 5 Claims is described in Section 4.3(c) below. (the "WARN GUC Claim"). The WARN GUC Claim would receive Distributions from the Liquidating Trust pro rata with other holders of Class 5 Claims, as described in more detail below. Said Distributions would be made to the WARN Act Settlement Administrator, who shall make further distribution and payment of any funds received on account of the WARN GUC Claim in accordance with the WARN Act Class Settlement

**(j)    Rejection of Executory Contracts**

Since the Petition Date, the Debtor has filed three omnibus motions seeking to reject certain executory contracts and unexpired leases. Those motions were granted by orders entered on July 31, 2019, January 9, 2020 and February 27, 2020, and the underlying contracts and leases have been rejected. Any executory contract or unexpired lease to which the Debtor was a party that has not been assumed or rejected by the Debtor pursuant to a Final Order of the Court as of the Effective Date (unless a motion to assume or reject such executory contract or unexpired lease is pending as of the Effective Date) shall be deemed rejected by the Debtor on the Effective Date. Notwithstanding anything to the contrary herein or in the Plan, (a) all insurance policies in force as of the Effective Date shall remain in effect following the Effective Date unless and until rejected by separate motion and/or terminated in accordance with their terms, and (b) the OS Agreement shall remain in effect until terminated under the terms therein.

## ARTICLE III
## CLASSIFICATION OF CLAIMS AND INTERESTS

### 3.1    Introduction

The following is a summary of the Plan. This overview is qualified in its entirety by reference to the provisions of the Plan. In accordance with Section 1123(a)(1) of the Bankruptcy Code, Allowed Administrative Expense Claims and Allowed Priority Tax Claims are not classified under the Plan. All other Claims and Interests in the Case are classified as shown below. The Plan provides that holders of Allowed Claims in certain classes will be entitled to a distribution of cash. Notwithstanding any provision of the Plan, a Claim in a particular Class is entitled to receive Distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class, and only to the extent such Claim has not been paid, released, or otherwise satisfied prior to the Effective Date.

### 3.2    Classifications

The Plan divides all classified Claims and Interests into the following Classes, which shall be mutually exclusive.

| | |
|---|---|
| Class 1: | Class 1 shall consist of all Allowed Other Priority Claims, if any. |
| Class 2: | Class 2 shall consist of Allowed Secured Claims against the Debtor that are not included in Class 3, if any. |
| Class 3: | Class 3 shall consist of the Allowed Prepetition Bank Claim. |
| Class 4: | Class 4 shall consist of all Allowed Claims of the WARN Act Settlement Class, except the WARN GUC Claim. |
| Class 5: | Class 5 shall consist of Allowed Unsecured Claims, including without limitation, the WARN GUC Claim. |
| Class 6: | Class 6 shall consist of all Insider Claims which are not Objecting Insider Claims. |
| Class 7: | Class 7 consists of all Allowed Equity Interests in the Debtor. |

**ARTICLE IV**
**DESCRIPTION OF CLAIMS AND TREATMENT UNDER THE PLAN**

Claims and Interests, as well as their treatment and an analysis of whether they are classified or unclassified and impaired or unimpaired, are described as follows:

**4.1    Unclassified Claims**

**(a)    Nonclassification**

In accordance with Section 1123(a)(1) of the Bankruptcy Code, Administrative Expenses and Priority Tax Claims have not been classified in the Plan. The treatment accorded to Administrative Expenses and Priority Tax Claims is set forth in Article II of the Plan.

**(b)    Administrative Expenses**

Allowed Administrative Expense Claims shall be paid by the Debtor from the Plan Funding Reserve as set forth below. Except as otherwise provided below, on or before the later to occur of (i) thirty (30) days following the Final Administrative Expense Claim Bar Date, or (ii) ten (10) business days following the date of entry of a Final Order allowing the Claim, each Holder of an Allowed Administrative Expense Claim shall be paid in full, in Cash in an amount equal to the Allowed Amount of its Administrative Expense Claim, in accordance with Section 1129(a)(9)(A) of the Bankruptcy Code. In the event that Allowed Professional Compensation Claims for the Committee's Professionals exceed $1,080,000, such excess Professional Compensation Claims shall be paid by the Liquidating Trustee from the GUC Amount. In the event that Allowed Professional Compensation Claims for the Debtor's Professionals exceed $1,337,839.36, then such excess Professional Fees shall not be payable from Estate Assets or Liquidation Trust Assets (but may be paid from the Fee Reserve established under the OS Agreement). In the case of Professional Compensation Claims which have been allowed by Final Order or that are otherwise payable pursuant to the Monthly Fee Procedures, to the extent not already paid, such Claims shall be paid in full, in Cash, no later than three (3) Business Days after the Effective Date, subject to the foregoing limitations and to disgorgement if not allowed pursuant to a final application for approval of such Professional Compensation Claims. If any such fees are disgorged they shall constitute Estate Assets and shall be payable to the Bank in accordance with the Plan. Notwithstanding the foregoing, each Holder of an Allowed Administrative Expense Claim may be paid (a) on such other terms as may be agreed upon by the Holder of such Allowed Administrative Expense Claim and the Debtor, with the written consent of the Bank, or (b) as otherwise ordered by a Final Order of the Bankruptcy Court.

**(c)    Fees and Charges**

All fees and charges assessed against the Estate under Chapter 123 of Title 28, United States Code, 28 U.S.C. §§1911-1930, which are incurred but unpaid for all periods through the Effective Date, will be paid on the Effective Date or as soon as reasonably practicable thereafter, by the Debtor from the Plan Funding Reserve or under the OS Agreement, to the extent provided therein.

**(d)**      **Applications for Allowance of Administrative Expenses**

All Holders of Administrative Expense Claims (other than Claims which arose on or before July 31, 2020, Claims pursuant to 11 U.S.C. § 503(b)(9) and Professional Compensation Claims) that do not file an application or other Bankruptcy Court-approved pleading on or before the Final Administrative Expense Claim Bar Date which is twenty (20) days after the Effective Date (unless such date is extended by the Court) will be forever barred from asserting such Administrative Expense Claim against the Debtor, the Estate, or the Liquidating Trustee. Claims arising under 11 U.S.C. §503(b)(9) were required to be filed by the Bar Date, and if they were not filed by the Bar Date, they are forever barred. Administrative Expense Claims arising from June 17, 2019 through and including July 31, 2020 were required to be filed by the Initial Administrative Expense Claim Bar Date, and if they were not filed by the Initial Administrative Claims Bar Date, they are forever barred.

**(e)**      **Applications for Final Allowance of Professional Compensation Claims**.

All Holders of Professional Compensation Claims must file with the Bankruptcy Court a final application for allowance and payment of fees and expenses on or before the Final Fee Application Deadline. Any Professional failing to file and serve such final application on or before the Final Fee Application Deadline shall be forever barred from asserting any such right to payment against the Debtor or the Estate. Objections to such Professional Compensation Claims, if any, must be filed and served no later than 20 days after the Final Fee Application Deadline.

**(f)**      **Priority Tax Claims**

The Debtor will pay from the Plan Funding Reserve all Allowed Priority Tax Claims in Cash in full on the Effective Date or as soon thereafter as is reasonably practicable, but in no event later than the end of five (5) years from the Petition Date. As to any Allowed Priority Tax Claim not paid in full on the Effective Date, the Holder of such Allowed Priority Tax Claim shall receive on account of such Allowed Priority Tax Claim regular quarterly installment payments in Cash in accordance with Section 1129(a)(9)(C) of the Bankruptcy Code through and including the date such Allowed Priority Tax Claim is paid in full. Holders of Allowed Priority Tax Claims shall receive interest on account of their Allowed Priority Tax Claims at the Section 6621 Interest Rate; provided, however, that if the Holder of such Allowed Priority Tax Claim is a city, county or state, such Holder shall receive interest on account of its Allowed Priority Tax Claim at the applicable statutory rate under state law. To the extent that any Allowed Priority Tax Claim is allowed after the Effective Date, it will be paid in full in Cash as soon after allowance as is reasonably practicable over a period no later than the end of five (5) years from the Petition Date, including interest as calculated above.

**4.2**      **Unimpaired Classes of Claims and Interests**

The following classes of Claims and Interests are unimpaired; therefore, under 11 U.S.C. § 1126(f), they will be conclusively presumed to have accepted the Plan.

**(a)    Class 1:  Other Priority Claims**

Each holder of an Allowed Other Priority Claim designated in Class 1 shall be paid as follows:

(i)  In full, in Cash, on or before the later of the Effective Date or, if an objection to such Claim is asserted, five business days following the date of a Final Order allowing any such Claim; or

(ii)  Upon such other terms as may be agreed to between the Debtor, the Bank  and a Holder of an Allowed Priority Claim.

Class 1 is unimpaired by the Plan.  Holders of Class 1 Claims are not entitled to vote to accept or reject the Plan.

**(b)    Class 2:  All Other Secured Claims**

Each Allowed Secured Claim in Class 2, if any, shall be satisfied, at the Debtor's option, as follows (i) by the transfer, assignment and conveyance by the Debtor of the collateral securing such Class 2 Claim to the Holder of such Allowed Secured Claim in full and final satisfaction of such Allowed Secured Claim, (ii) by the sale of the collateral securing such Allowed Secured Claim, following Designated Notice, and the payment by the Debtor to the Holder of such Allowed Secured Claim of the net sale proceeds in an amount equal to the value of such Holder's interest in the collateral in full and final satisfaction of such Allowed Secured Claim, or (iii) by payment of Cash to the Holder of such Allowed Secured Claim in an amount equal to the value of such holder's interest in the collateral securing the Allowed Secured Claim.

**4.3    Impaired Classes of Claims and Interests**

The following classes of Claims and Interests are impaired; therefore, Holders of such Claims are entitled to vote on the Plan.

**(a)    Class 3: Prepetition Bank Claim**

Class 3 consists of the Prepetition Bank Claim of the Bank against the Debtor. The Allowed amount of the Prepetition Bank Claim shall be $102,949,851.95.  On the Effective Date, the Holder of the Prepetition Bank Claim shall receive all of the Estate Assets and their proceeds, free and clear of all Claims and Liens other than the Claims and Liens of the Bank, except for the Liquidating Trust Assets and the Plan Funding Reserve.  The Debtor shall execute any and all documents requested by the Bank necessary to convey the Estate Assets, except the Liquidating Trust Assets, to the Bank or the Bank's designee.  The Debtor shall fully cooperate with the Bank in converting the Estate Assets, except the Liquidating Trust Assets, to Cash.  The Bank is hereby granted an irrevocable power of attorney on behalf of the Debtor, the Post-Effective Date Debtor, and the Estate with respect to the transfer and collection of the Estate Assets.  Notwithstanding anything to the contrary in the Plan, any Post-Effective Date Debtor Expenses (including Post-Petition Debtor Professional Fees) shall be payable from the Fee Reserve under the OS Agreement

or the Plan Funding Reserve (but only to the extent funds in the Plan Funding Reserve are not used to pay Confirmation Expenses). The Committee (if extant) and the Liquidating Trustee shall reasonably cooperate at no cost to themselves with the Bank in converting the Estate Assets, except the Liquidating Trust Assets, to Cash and conveying the same to the Bank or the Bank's designee. After the Effective Date, as soon as practicable the Bank shall receive any portion of the Plan Funding Reserve not used to satisfy Confirmation Expenses or reserved for (a) Confirmation Expenses which are the subject of a pending objection as of the Effective Date, or (b) reasonably anticipated Post-Effective Date Debtor Expenses. As of the Effective Date, the Bank shall waive any diminution claim, including the Superpriority Claim (as defined in the Cash Collateral Order), and any deficiency claim against the Debtor and the Estate but the Bank shall retain its Claims and Liens against the Estate Assets, except for the Liquidating Trust Assets. For avoidance of doubt, the Bank shall release Claims and Liens, if any, on or against any of the Liquidating Trust Assets. Additionally, for the avoidance of doubt, the Bank shall retain any Claims and Liens it has against any Insiders and any non-Debtor obligors of the Prepetition Bank Claim and their collateral and shall not be deemed to release any such Claims or Liens. Except as expressly modified herein, on and after the Effective Date the Bank shall retain all rights under the Cash Collateral Order. As of the Effective Date, the Committee, the Debtor, the Estate, and the Liquidating Trustee shall be deemed to have waived any and all Claims or Causes of Action that they may have against the Bank. Within three (3) Business Days after the Effective Date, the Standing Motion shall be withdrawn with prejudice by the Committee.

**(b)   Class 4: WARN Act Class Claims**

Class 4 consists of all Allowed Claims in favor of the WARN Act Settlement Class, except for the WARN GUC Claim which shall be part of Class 5. The WARN Act Class Claims shall be treated as provided in the WARN Act Class Settlement, which is expressly incorporated herein by reference. Class 4 is Impaired by the Plan. The Class Representatives shall be entitled to vote to accept or reject the Plan on behalf of Class 4.

(a) ***WARN Claim.*** No later than ten (10) days following the Effective Date the Debtor shall make payment on account of the WARN Claim from the Plan Funding Reserve to the WARN Act Settlement Administrator in the amount of $887,500 (which amount shall be inclusive of any withholding and FICA taxes payable by the employer and employees), which, in addition to the WARN Net Recovery, shall be in full satisfaction of the WARN Claim. The WARN Act Settlement Administrator shall make further distribution and payment of said funds in accordance with the WARN Act Class Settlement.

(b) **WARN Net Recovery**. The Liquidating Trustee shall pay any WARN Net Recovery to the WARN Act Settlement Administrator in accordance with the WARN Act Class Settlement. The WARN Act Settlement Administrator shall make further distribution and payment of said funds in accordance with the WARN Act Class Settlement.

**(c)   Class 5: Unsecured Claims**

Class 5 consists of all Allowed Unsecured Claims, including the WARN GUC Claim. As soon as is reasonably practicable following the Effective Date, as determined by the Liquidating Trustee in his or her sole discretion, the Liquidating Trustee shall make a pro-rata Distribution to

the Holders of Allowed Class 5 Claims of the Liquidation Proceeds less the Retained Proceeds. On each Distribution Date or as soon thereafter as is reasonably practicable, the Liquidating Trustee shall make pro-rata Distributions to the holders of Allowed Class 5 Claims of any available Liquidation Proceeds less Retained Proceeds that remain in the Liquidating Trust, until the date on which all Allowed Class 5 Claims have been paid in full.  If Liquidation Proceeds remain after all expenses of the Liquidating Trust and all Disputed Claims have either been reserved or an appropriate reserve established, Holders of Allowed Class 5 Claims shall be entitled to interest on their Allowed Class 5 Claim calculated at the post-judgment rate of interest for the State of Georgia.  The WARN Act Settlement Administrator shall make further distribution and payment of any funds received on account of the WARN GUC Claim in accordance with the WARN Act Class Settlement.

    **(d)**  **Class 6: Insider Claims**

Class 6 consists of all Insider Claims which are not Objecting Insider Claims.  As of the Effective Date, all Class 6 Claims shall be disallowed; provided, however, that in lieu of disallowance of its Class 6 Claim each Holder of a Class 6 Claim may elect to convert its Claim into equity in the Post-Effective Date Debtor (each, an "***Electing Holder***").  Such election may be made only by delivery to the Debtor on or before the Effective Date of written notice of the Holder's election to convert its Class 6 Claim into equity of the Debtor following the Effective Date.  Such election must be made with respect to the Electing Holder's entire Class 6 Claim and no partial election shall be permitted.  A total of 2500 shares of common stock in the Post-Effective Date Debtor (the "***New Shares***") with a par value of $100,000 for each share shall be authorized and issued to the Electing Holders Holders such that an Electing Holder shall receive one share of common stock in the Post-Effective Debtor for each $100,000 of its Insider Claim with any amount of an Insider Claim between $50,000 and $99,999.99 rounded up to the nearest $100,000. Promptly following the Effective Date, the Debtor shall calculate the total amount of Class 6 Claims which have elected to convert to equity and shall issue New Shares in the Post-Effective Date Debtor to each Electing Holder.  For purposes of such calculation, the amount of each Electing Holder's Class 6 Claim shall be deemed to be the amount shown in its last timely filed proof of claim (or if no proof of claim was timely filed, as shown in the Debtor's Schedules, if such claim was not scheduled as contingent, disputed or unliquidated, or as set forth in the Plan); provided, however, notwithstanding the foregoing, the amount of the Insider Claim of VSS and the Class 6 Claim of VSS as an Electing Holder shall be deemed to be $113,562,898.30 in the event VSS files a proof of claim in that amount on or before the date of the Confirmation Hearing rather than the amount shown in the Debtor's Schedules such that VSS shall receive 1,114 shares of common stock in the Post-Effective Debtor as an Electing Holder.  As of the Effective Date, the Debtor's Articles of Incorporation and Bylaws shall be deemed to be amended to permit the issuance of the New Shares in the Post-Effective Date Debtor as set forth above.  Each Holder of an Insider Claim which is not an Objecting Insider Claim shall be deemed to be an Insider Released Party under Article VII, Section 7.04 of the Plan.  Except for the conversion rights provided above for Electing Holders, no Class 6 Claim shall receive any distribution under the Plan.

    **(e)**  **Class 7: Equity Interests**

Class 7 consists of all Allowed Equity Interests in the Debtor.  The Holders of Allowed Equity Interests in Class 7 shall retain their Equity Interests in the Post-Effective Date Debtor and

shall receive no distributions of Cash or other Property under the Plan on account of such Equity Interests.

**ARTICLE V**

**MEANS FOR IMPLEMENTATION OF THE PLAN**

**5.1    Creation of Liquidating Trust**.

On the Effective Date, the Liquidating Trust shall be created.  The Liquidating Trust shall be governed by the Liquidating Trust Agreement, the Plan and the Confirmation Order.  A copy of the Liquidating Trust Agreement is attached to the Plan as Schedule 6.01.  The primary purpose of the Liquidating Trust will be to collect and distribute proceeds to its Beneficiaries as well as to prosecute any Causes of Action, including Avoidance Actions, which are not expressly released or waived under the Plan.  Potential Avoidance Actions are identified in the Debtor's Schedules. The initial Liquidating Trustee shall be Advisory Trust Group, LLC.

**5.2    Transfer and Vesting of Assets to the Liquidating Trust**

On the Effective Date, or such later dates as are specified in the Plan, the Debtor shall, pursuant to Section 1123(b) of the Bankruptcy Code, transfer all Liquidating Trust Assets to the Liquidating Trust.  All transfers to the Liquidating Trust shall be free and clear of all liens, claims, interests and encumbrances, except as otherwise set forth in the Plan.  For the avoidance of doubt, except as expressly provided in the Plan or the Confirmation Order, nothing in the Plan or Disclosure Statement shall be construed to restrict or limit the ability or standing of the Liquidating Trustee to assert any Causes of Action transferred to the Liquidating Trust.  In connection with any Causes of Action that are included in the Liquidating Trust, any attorney-client privilege, work-product privilege or protection, or other privilege or immunity attaching to any documents or communications thereto (whether written or oral) will also exist for the benefit of the Liquidating Trust and will vest in the Liquidating Trustee and his or her representatives.  The Liquidating Trustee is authorized to take all necessary actions to benefit from such privileges.  For federal income tax purposes, the transfer of the Liquidating Trust Assets to the Liquidating Trust will be deemed to be a transfer to the Holders of Allowed Claims (who are the Liquidating Trust Beneficiaries), followed by a deemed transfer by such Liquidating Trust Beneficiaries to the Liquidating Trust.

**5.3    Treatment of Liquidating Trust for Federal Income Tax Purposes; No Successor-in-Interest**

The Liquidating Trust will be established for the primary purpose of liquidating the Liquidating Trust Assets, in accordance with Treas. Reg. § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust.  Accordingly, the Liquidating Trustee will, in an expeditious but orderly manner, liquidate and convert to Cash the Liquidating Trust Assets, make timely distributions to the Liquidating Trust Beneficiaries in accordance with the Plan and the Liquidating Trust Agreement and not unduly prolong its duration. The Liquidating Trust will not be deemed a successor-in-interest of the Debtor for any purpose

other than as specifically set forth herein or in the Liquidating Trust Agreement and is a separate and distinct legal entity from the Debtor.

The Liquidating Trust is intended to be treated as a "liquidating trust" pursuant to Treasury Regulation § 301.7701-4(d) and as a "grantor trust" for federal income tax purposes, pursuant to Section 671 through 679 of the Internal Revenue Code of 1986, as amended (the "IR Code"). In the event that the Liquidating Trust shall fail or cease to qualify as a liquidating trust in accordance with Treasury Regulations Section 301.770194(d), the Liquidating Trustee shall take such action as he or she shall deem appropriate to have the Liquidating Trust classified as a partnership for federal tax purposes under Treasury Regulations Section 301.7701-3 (but not a publicly traded partnership within the meaning of Section 7704 of the IR Code), including, if necessary, creating or converting it into a Delaware limited partnership or limited liability company that is so classified. For federal income tax purposes, the Liquidating Trust Beneficiaries will be treated as the grantors and owners of the Liquidating Trust and, therefore, will be responsible for the payment of tax on their respective allocable share of the taxable income of the Liquidating Trust.

Except as expressly provided in the Plan, the Post-Effective Date Debtor shall have no obligation or responsibility to the Liquidating Trust and shall not be liable for any liabilities of the Liquidating Trust. Neither the Post-Effective Date Debtor nor the Holders of Insider Claims in Class 6 shall be Liquidating Trust Beneficiaries.

As soon as reasonably practicable after the Effective Date, the Liquidating Trustee (to the extent that the Liquidating Trustee deems it necessary or appropriate in his or her sole discretion) will value the Liquidating Trust Assets based on the good faith determination of the value of such Liquidating Trust Assets. The valuation will be used consistently by all parties (including the Debtor, the Liquidating Trustee, and the Liquidating Trust Beneficiaries) for all federal income tax purposes. The Bankruptcy Court will resolve any dispute regarding the valuation of the Liquidating Trust Assets. The right and power of the Liquidating Trustee to invest the Liquidating Trust Assets transferred to the Liquidating Trust, the proceeds thereof, or any income earned by the Liquidating Trust, will be limited to the right and power to invest such Liquidating Trust Assets (pending distributions in accordance with the Plan).

### 5.4    Rights and Obligations of the Liquidating Trustee

The Liquidating Trustee shall have the rights, duties and obligations set forth in the Liquidating Trust Agreement and the Plan. Such rights, duties and obligations include, but are not limited to, exercising control and authority over the Liquidating Trust Assets and responsibility for liquidating and administering (or abandoning, as the case may be) the Liquidating Trust Assets and taking actions on behalf of, and representing, the Liquidating Trust. Except for those matters expressly reserved in the Plan for the Post-Effective Date Debtor or the Bank, the Liquidating Trustee shall be the representative of the Estate as contemplated by Section 1123(b)(3)(B) of the Bankruptcy Code and shall have the rights and powers of a trustee appointed under Sections 702 and 1104 of the Bankruptcy Code to act on behalf of the Estate and the Liquidating Trust with regard to the administration of the Case and the Liquidating Trust Assets  and the Liquidating Trust. The Liquidating Trustee shall have the authority to bind the Liquidating Trust within the limitations set forth in the Liquidating Trust Agreement, the Plan and the Confirmation Order, but shall for all purposes hereunder be acting in the capacity of Liquidating Trustee and not

individually. Within the limitations set forth in the Liquidating Trust Agreement and subject to the provisions of the Plan, the responsibilities and authority of the Liquidating Trustee, shall include, without limitation: (a) the making of Distributions to Holders of Allowed Liquidating Trust Claims as contemplated in the Plan; (b) establishing and maintaining disputed claim reserves to be determined in the discretion of the Liquidating Trustee; (c) conducting an analysis of the Liquidating Trust Claims not already allowed by prior order of the Court, and prosecuting objections thereto or settling or otherwise compromising such Liquidating Trust Claims if necessary and appropriate in accordance with the Plan; (d) filing appropriate tax returns with respect to the Liquidating Trust in the exercise of its fiduciary obligations; (e) retaining the Professionals and other Persons without further order of the Bankruptcy Code, and compensating and reimbursing the expenses of those professionals and other Persons on the terms to be agreed to by the Liquidating Trustee and such Professionals and other Persons without further order of the Bankruptcy Court, to the extent set forth in the Liquidation Trust Agreement; (f) taking such actions as are necessary to prosecute, resolve or compromise, as appropriate, all Causes of Action assigned to the Liquidating Trust; (g) opening, closing and maintaining new or existing bank accounts, letters of credit and other financial instruments; (h) preparing and filing U.S. Trustee Postconfirmation quarterly reports, until such time as the Bankruptcy Court enters an order (i) dismissing the Bankruptcy Case, (ii) converting the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code, or (iii) approving a final decree closing the Bankruptcy Case; (i) investing Cash and other Liquidating Trust Assets in Permissible Investments or otherwise in accordance with Bankruptcy Code section 345; (j) collecting and liquidating the Liquidating Trust Assets; (k) asserting and enforcing all legal or equitable remedies and defenses belonging to the Debtor or its Estate with respect to the Liquidating Trust Assets and the Liquidating Trust Claims, including, without limitation, setoff, recoupment, and any rights under Bankruptcy Code section 502(d); (l) taking such actions the Liquidating Trustee deems appropriate in his or her reasonable business judgment against any Person with respect to a Liquidating Trust Claim or a Liquidating Trust Asset and commencing any process or proceeding in the Bankruptcy Court or in any court of competent jurisdiction in accordance with applicable laws, to the extent set forth in the Liquidating Trust Agreement; (m) proceeding with and employing all discovery devices permitted under applicable law, including Rule 2004 of the Bankruptcy Rules, in order to investigate any Liquidating Trust Claims or Causes of Action; (n) asserting and/or waiving, as the Liquidating Trustee deems appropriate, any attorney-client privilege or similar privilege belonging to the Debtor immediately prior to the Effective Date and relating to the Liquidating Trust Assets; and (o) executing and delivering all documents and taking such actions as are necessary and reasonable to carry out the purposes of the Liquidating Trust and the Plan.

### 5.5    Post-Confirmation Report of Liquidating Trust

The Debtor shall file monthly operating reports for the period through the Effective Date. The Liquidating Trustee shall file all required post-confirmation operating reports through the date the Case is closed. The Debtor shall cooperate with the Liquidating Trustee and provide any information required to prepare such post-confirmation reports. Any cost incurred by the Debtor in connection therewith shall be deemed to be a Post-Effective Date Debtor Expense.

**5.6    Dissolution of Liquidating Trust**

The Liquidating Trust will be dissolved no later than six (6) years from the Effective Date unless the Bankruptcy Court, upon a motion filed prior to the sixth (6th) anniversary or the end of any extension period approved by the Bankruptcy Court (the filing of which will automatically extend the term of the Liquidating Trust pending the entry of an order by the Bankruptcy Court granting or denying the motion), determines that a fixed period extension (not to exceed two (2) years, together with any prior extensions, without a favorable letter ruling from the Internal Revenue Service or opinion letter that any further extension would not adversely affect the status of the Liquidating Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets. After (a) the final Distribution of the Disputed Claims Reserve and the balance of the Liquidating Trust Assets pursuant to the Plan, and (b) the filing by or on behalf of the Liquidating Trust of a certification of dissolution with the Bankruptcy Court in accordance with this Plan, the Liquidating Trust will be deemed dissolved for all purposes without the necessity for any other or further actions.

**5.7    Dissolution of the Committee**

On the Effective Date, the Committee will be dissolved and the members of the Committee shall be released and discharged from all further authority, duties, responsibilities, and obligations arising from or related to the Bankruptcy Case and Professionals retained by the Committee shall be released and discharged from all further authority, duties, responsibilities, and obligations relating to the Debtor and the Bankruptcy Case; provided, however, that the foregoing shall not apply to any matters concerning (a) any Professional Compensation Claims held or asserted by any Professional retained by the Committee or reimbursement of any reasonable and documented expenses of the Committee's members incurred in their capacity as such, (b) any appeal from the Confirmation Order, or (c) the withdrawal of the Standing Motion pursuant to Section 5.05 of the Plan, or (d) cooperating in conveying the Estate Assets to the Bank.

**5.8    Further Transactions**

The Liquidating Trustee shall be authorized to execute, deliver, file, and/or record such contracts, instruments, releases, indentures, and other agreements or documents, and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  In order to facilitate the liquidation and distribution of the Liquidating Trust Assets and the wind-up of the Debtor's affairs, on the Effective Date the Liquidating Trustee shall be deemed, by operation of law and the Confirmation Order and without need for any action by any person affiliated with the Debtor or any officer or director of the Debtor, to hold an irrevocable power of attorney on behalf of the Debtor and the Estate with respect to all Liquidating Trust Assets.

**5.9    Administration of Claims**

Prior to and subsequent to the Effective Date, the Debtor shall review the Debtor Priority Claims and audit these Claims with regard to (i) the supporting documents evidencing the Claims; (ii) the appropriateness of the asserted priority of each Claim; (iii) the amount of the Claim; (iv) the extent to which the Debtor originally scheduled the Claim as contingent, disputed or

unliquidated; and (v) whether the Claim is otherwise valid, permissible, due and payable under the Bankruptcy Code and applicable state law. Subsequent to the Effective Date, the Liquidating Trustee shall review the Liquidating Trust Claims and audit these Claims with regard to (i) the supporting documents evidencing the Claims; (ii) the appropriateness of the asserted priority of each Claim; (iii) the amount of the Claim; (iv) the extent to which the Debtor originally scheduled the Claim as contingent, disputed or unliquidated; and (v) whether the Claim is otherwise valid, permissible, due and payable under the Bankruptcy Code and applicable state law. Following the Effective Date, the Liquidating Trustee and the Post-Effective Date Debtor shall complete their respective reviews of the Claims and shall initiate, file and prosecute any and all actions deemed necessary and appropriate to dispute, disallow, object to or otherwise quantify the Claims against the Post-Effective Date Debtor and/or its Estate. All Claims Litigation related to Debtor Priority Claims, including actions that arise out of the amount of any such Claim, or any objection to such a Claim, shall vest with the Post-Effective Date Debtor and shall be prosecuted by the Post-Effective Date Debtor and/or the Bank, and any Post-Effective Date Debtor Expenses incurred in connection therewith shall be paid as set forth in Sections 5.05 and 6.14 of the Plan. All Claims Litigation related to Liquidating Trust Claims, including actions that arise out of the amount of any such Claim, or any objection to such a Claim, shall vest with the Liquidating Trust and shall be prosecuted by the Liquidating Trustee, and all expenses related thereto shall be paid from the Liquidating Trust Expense Fund as set forth in the Plan and the Liquidating Trust Agreement. The Post-Effective Date Debtor shall take actions regarding the administration, reconciliation and settlement of Debtor Priority Claims, and shall object to such Claims and prosecute Claims Litigation related to such claims, until such time as the Post-Effective Date Debtor determines that further pursuit of litigation or actions objecting to such Claims is no longer cost efficient, and will be of no further benefit to the Estate and its creditors, except that the Bank may also object to such claims and prosecute Claims Litigation against such Claims. The Liquidating Trustee shall take actions regarding the administration, reconciliation and settlement of Liquidating Claims, and shall object to such Claims and prosecute Claims Litigation related to such claims, until such time as the Liquidating Trustee determines that further pursuit of litigation or actions objecting to such Claims is no longer cost efficient, and will be of no further benefit to the Estate and its creditors. **THE FAILURE TO OBJECT TO ANY CLAIM PRIOR TO THE COMMENCEMENT OF THE HEARING ON CONFIRMATION OF THE PLAN SHALL NOT BE DEEMED TO BE A WAIVER OF THE RIGHT TO OBJECT THEREAFTER TO SUCH CLAIM IN WHOLE OR IN PART FOR THE PURPOSE OF DISTRIBUTION.**

### 5.10    Post- Effective Date Debtor Expenses

Post-Effective Date Debtor Expenses, including Post-Effective Date Debtor Professional Fees, shall be charged against and paid from the Fee Reserve under the OS Agreement or the Plan Funding Reserve (but only to the extent funds in the Plan Funding Reserve are not used to pay Confirmation Expenses). The Post-Effective Date Debtor may submit periodic statements for Post-Effective Date Debtor Expenses incurred to the Bank for review and approval. The Bank will have ten (10) days to object to any such statement. In the event that any such objection is received by the Post-Effective Date Debtor and cannot be promptly resolved by the Post-Effective Date Debtor and the Bank, the dispute will be submitted by the Post-Effective Date Debtor to the Bankruptcy Court for adjudication following Designated Notice. Any undisputed portion of such disputed invoice shall be promptly paid. The Bankruptcy Court will retain jurisdiction to

adjudicate any such objection. In the event that no objection is raised to a statement within the ten (10) day period, such statement may be promptly paid.

### 5.11    Preservation of Rights of Action

Except as otherwise expressly provided in the Plan, any rights or Causes of Action accruing to or held by the Debtor or its Estate prior to the Effective Date shall be deemed Assets of, and vest in, the Liquidating Trust on the Effective Date, including but not limited to those Causes of Action specifically identified in the Disclosure Statement. The Liquidating Trustee may pursue those Causes of Action, as deemed appropriate. The Plan, Disclosure Statement and Schedules do not set forth an exhaustive list of all Causes of Action preserved under the Plan and vesting in the Liquidating Trust and the failure to identify or list any particular Cause of Action therein shall not constitute a waiver or release of such Cause of Action. Notwithstanding anything to the contrary set forth herein, as of the Effective Date the Liquidating Trustee shall be deemed to have released all Avoidance Actions against: (a) the Bank; and (b) any party who (i) does not hold an Insider Claim, and (ii) provided goods or services to the Debtor in the ordinary course of the Debtor's business. *For avoidance of doubt, Avoidance Actions against Kajima Buildings and Design, Inc. shall not be released*. All Avoidance Actions and other Causes of Action against any Creditor holding an Objecting Insider Claim are expressly preserved. **ALL CAUSES OF ACTIONS NOT EXPRESSLY RELEASED OR WAIVED IN THE PLAN OR THE CONFIRMATION ORDER SHALL SURVIVE CONFIRMATION, AND THE ASSERTION OF CAUSES OF ACTIONS SHALL NOT BE BARRED OR LIMITED BY ANY ESTOPPEL, WHETHER JUDICIAL, EQUITABLE OR OTHERWISE**.

### ARTICLE VI
### DISTRIBUTION TO HOLDERS OF CLAIMS

### 6.1    Date of Distributions

As soon as is reasonably practicable following the Effective Date, as determined by the Liquidating Trustee in his or her sole discretion, the Liquidating Trustee shall use the Liquidation Proceeds to make Distributions with respect to Allowed Liquidating Trust Claims, as and to the extent provided for in the Plan or as ordered by the Court. Subsequent to the Effective Date, the Liquidating Trustee shall use the Liquidation Proceeds to make Distributions, on each Distribution Date or as soon thereafter as is reasonably practicable, with respect to Allowed Liquidating Trust Claims as contemplated by and to the extent set forth in the Plan. The Liquidating Trustee shall continue to make Distributions out of the Liquidation Proceeds up to and including the Consummation Date, on which date the Liquidating Trustee will make the final Distribution under the Plan.

### 6.2    Payments by Cash

All payments made pursuant to this Plan shall be in Cash and by any means reasonably selected by the Liquidating Trustee or the Debtor, as applicable, including check or wire transfer. If a Cash payment to be received by any Holder of an Allowed Claim in Class 5 on any Distribution Date (except the final Distribution) would be $100 or less in the aggregate, notwithstanding any contrary provision of the Plan, in the Liquidating Trustee's sole discretion, no such payment will

be made to such Holder, and such Cash, if applicable, shall be held for such Holder until the next Distribution Date, at which time such Cash payment shall be made to the Holder. The Liquidating Trustee shall include an additional amount in the Unpaid Claims Reserve for unpaid Distributions resulting from such undistributable small amounts.

**6.3    Rounding**

Whenever any payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding of such fraction down to the nearest whole cent.

**6.4    No Interest on Claims**

Except as provided in a Final Order entered in the Case or as provided in Article V, Section 5.07 of the Plan, (a) no holder of any Unsecured Claim (except Priority Tax Claims) shall be entitled to interest accruing on or after the Petition Date on such Claim, and (b) interest shall not accrue or be paid upon any Disputed Claim with respect to the period from the Petition Date to the date a final Distribution is made thereon if and after such Disputed Claim, or any part thereof, becomes an Allowed Claim.

**6.5    Effect of Preconfirmation Distributions**

Nothing in the Plan shall be deemed to entitle the Holder of a Claim that received, prior to the Effective Date, full or partial payment of such Holder's Claim, by way of settlement or otherwise, pursuant to a Final Order of the Bankruptcy Court, provision of the Bankruptcy Code, or other means, to receive a duplicate payment in full or in part pursuant to the Plan; and all such full or partial payments shall be deemed to be payments made under the Plan for purposes of satisfying the obligations of the Debtor or the Liquidating Trustee to such Holder under the Plan.

**6.6    Disputed Claims**

If a Proof of Claim is filed by any Creditor asserting a Claim for the same obligation which had previously been listed for such Creditor by the Debtor on the Schedules, then the Scheduled Claim shall be deemed a Disallowed Claim without the need for the Debtor, the Liquidating Trustee or any party in interest to file an objection to such Scheduled Claim. The Claim asserted in the Proof of Claim shall be deemed to replace such Scheduled Claim and shall ultimately become an Allowed Claim, a Disputed Claim or a Disallowed Claim pursuant to the procedures set forth in this Plan.

Notwithstanding any other provisions of the Plan, no payments or distribution shall be made on account of a Disputed Claim until and unless such Claim becomes an Allowed Claim. In lieu of distributions under the Plan to holders of Disputed Debtor Priority Claims, a Disputed Claims Reserve shall be maintained by the Post-Effective Date Debtor in escrow with Truist Bank for payment of any Disputed Debtor Priority Claim which becomes an Allowed Claim. In lieu of distributions under the Plan to holders of Disputed Liquidating Trust Claims, a Disputed Claims Reserve shall be maintained by the Liquidating Trustee for payment of any Disputed Liquidating Trust Claim which becomes an Allowed Claim. Distributions on account of any Disputed Claim

that has become an Allowed Claim shall be made within the time periods provided above in Article V, or as soon as is reasonably practicable following allowance of the Claim.

**6.7     Procedures for Resolving Disputed Claims**

Subsequent to the Effective Date, the Debtor, with the express written consent of the Bank, shall have the authority to settle and resolve a Disputed Debtor Priority Claim that was originally asserted in an amount equal to or less than One Hundred Fifty Thousand Dollars ($150,000.00) upon such terms and conditions as the Debtor deems appropriate and in the best interests of the Estate.  Any such compromise and settlement shall be deemed final and binding upon all parties in interest in the Case.  The Debtor shall not have any obligation to provide notice to or file and serve pleadings upon any such parties in interest, and shall not have any requirement to obtain Court approval, in connection with compromising these Claims

Subsequent to the Effective Date, the Liquidating Trustee shall have the authority to settle and resolve a Disputed Liquidating Trust Claim that was originally asserted in an amount equal to or less than One Hundred Fifty Thousand Dollars ($150,000.00) upon such terms and conditions as the Liquidating Trustee deems appropriate and in the best interests of the Estate. Any such compromise and settlement shall be deemed final and binding upon all parties in interest in the Case.  The Liquidating Trustee shall not have any obligation to provide notice to or file and serve pleadings upon any such parties in interest, and shall not have any requirement to obtain Court approval, in connection with compromising these Claims.

With respect to any Disputed Debtor Priority Claim that was originally asserted in an amount that exceeds One Hundred Fifty Thousand Dollars ($150,000.00), the Post-Effective Date Debtor, with the express written consent of the Bank, shall have the authority to compromise and settle any such Claim on such terms as the Post-Effective Date Debtor deems appropriate and in the best interests of the Estate, subject to providing Designated Notice of any such proposed compromise and a reasonable opportunity to object thereto.  If a party in interest files a written objection with the Court in the Case with respect to any proposed compromise of any Disputed Debtor Priority Claim, and serves a copy of said objection upon the Post-Effective Date Debtor and its counsel, within ten (10) days from the service of Designated Notice of the proposed compromise, then the Court shall schedule a hearing with respect to said objection.  If no objection is timely filed and served, the Post-Effective Date Debtor may compromise and settle any Disputed Debtor Priority Claim without further authorization.  The Post-Effective Date Debtor may file motions which seek to compromise more than one Debtor Priority Claim.

With respect to any Disputed Liquidating Trust Claim that was originally asserted in an amount that exceeds One Hundred Fifty Thousand Dollars ($150,000.00), the Liquidating Trustee shall have the authority to compromise and settle any such Claim on such terms as the Liquidating Trustee deems appropriate and in the best interests of the Estate, subject to providing Designated Notice of any such proposed compromise and a reasonable opportunity to object thereto.  If a party in interest files a written objection with the Court in the Case with respect to any proposed compromise of any Disputed Liquidating Trust Claim, and serves a copy of said objection upon the Liquidating Trustee and his or her counsel, within ten (10) days from the service of Designated Notice of the proposed compromise, then the Court shall schedule a hearing with respect to said objection.  If no objection is timely filed and served, the Liquidating

Trustee may compromise and settle any Disputed Liquidating Trust Claim without further authorization. The Liquidating Trustee may file motions which seek to compromise more than one Liquidating Trust Claim.

### 6.8 Unclaimed Property

Unclaimed Property shall be held in an "Unpaid Claims Reserve" to be held for the benefit of the holders of Allowed Liquidating Trust Claims entitled thereto under the terms of the Plan. For a period of 180 days following the first Distribution to Holders of Allowed Liquidating Trust Claims (said period being hereinafter referred to as the "**Claiming Period**"), Unclaimed Property shall be held in the Unpaid Claims Reserve solely for the benefit of the Holders of Allowed Liquidating Trust Claims which have failed to claim such property. During the Claiming Period, Unclaimed Property due the Holder of an Allowed Liquidating Trust Claim shall be released from the Unpaid Claims Reserve and delivered to such holder upon presentation of proper proof by such holder of its entitlement thereto. In the event that there is Unclaimed Property in the Unpaid Claims Reserve with regard to any Liquidating Trust Claim, the Liquidating Trustee shall, until such Unclaimed Property is claimed or the Claiming Period with regard to the holder of such Claim has expired, make all subsequent Distributions due with regard to such Claim to the Unpaid Claims Reserve. After the Claiming Period with regard to such holder has expired, no subsequent Distributions shall be made on account of such Claim, and such Claim shall be treated as being disallowed, waived, and satisfied. At the end of the Claiming Period, the Holder of an Allowed Liquidating Trust Claim theretofore entitled to Unclaimed Property shall cease to be entitled thereto and the Unclaimed Property shall be Liquidation Proceeds. The Unpaid Claims Reserve may be (but shall not be required to be) maintained as an interest-bearing account. All interest earned thereon shall be Liquidation Proceeds, and no claimant entitled to funds from the Unpaid Claims Reserve shall be entitled to interest with regard to the amounts due to such claimant.

### ARTICLE VII
### EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 7.1 Rejection of Executory Contracts and Unexpired Leases

Any executory contract or unexpired lease to which the Debtor was a party that has not been assumed or rejected by the Debtor pursuant to a Final Order of the Court as of the Effective Date (unless a motion to assume or reject such executory contract or unexpired lease is pending as of the Effective Date) shall be deemed rejected by the Debtor on the Effective Date. The Confirmation Order will constitute an order of the Bankruptcy Court, pursuant to Section 365 of the Bankruptcy Code, approving the rejection of Executory Contracts and Unexpired Leases which do not constitute Assumed Contracts. Notwithstanding anything to the contrary in the Plan or Disclosure Statement, (a) all insurance policies in force as of the Effective Date shall remain in effect following the Effective Date unless and until rejected by separate motion and/or terminated in accordance with their terms, and (b) the OS Agreement shall remain in effect until terminated under the terms therein.

**7.2     Approval of Rejection of Executory Contracts and Unexpired Leases**

Entry of the Confirmation Order shall, subject to and upon the occurrence of the Effective Date, constitute the approval, pursuant to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection of the Executory Contracts and Unexpired Leases rejected pursuant to Article X, Section 10.1 of the Plan.

**7.3     Inclusiveness**

Each Executory Contract and Unexpired Lease to be rejected pursuant to the terms of the Plan shall include all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affect such Executory Contract or Unexpired Lease.

**7.4     Claims under Rejected Executory Contracts and Unexpired Leases**

Claims arising from the rejection of any executory contracts or unexpired leases shall be filed within thirty (30) days following the rejection and shall be treated as Class 5 Claims to the extent Allowed.  Any person seeking to assert such a Claim who fails to file a proof of claim within this thirty (30) day period shall be deemed to have waived said Claim, and it shall be forever barred from asserting a Claim based on such rejection.

**ARTICLE VIII**
**CONDITIONS PRECEDENT TO EFFECTIVENESS OF PLAN**

**8.1**     Entry of the Confirmation Order, effectiveness of Confirmation of the Plan, and the obligation of the Debtor to consummate this Plan are conditioned upon the Bankruptcy Court having made findings and determinations regarding the Plan as will enable the entry of the Confirmation Order in a manner consistent with the provisions of the Plan and in form and substance satisfactory to the Debtor, the Bank and the Committee.

**8.2**     The Effective Date will not occur and the Plan will not be consummated until:

(a)     The Confirmation Order shall have been entered by the Bankruptcy Court and there shall not be a stay or injunction (or similar prohibition) in effect with respect thereto.

(b)     All requisite filings with governmental authorities and third parties shall have become effective, and all governmental authorities and third parties shall have approved or consented to the Plan, to the extent required.

(c)     All documents contemplated by the Plan to be executed and delivered on or before the Effective Date shall have been executed and delivered.

(d)     The Liquidating Trustee shall have been designated by the Committee and shall be empowered to take all actions as contemplated by the Liquidating Trust Agreement.

(e)     The aggregate amount of Confirmation Expenses shall not exceed $3,208,500

unless the Bank consents in writing to waive this condition.

Other than condition (a) above, each condition precedent may be waived or modified by the Debtor, with the written consent of the Bank and the Committee, without further Court approval. If the Effective Date does not occur by December 15, 2020, the Plan shall be void and of no effect, unless the Debtor, the Bank, and the Committee file with the Court a written stipulation agreeing to extend this deadline.

## ARTICLE IX
## VOTING ON THE PLAN AND THE CONFIRMATION PROCESS

### 9.1    Classes Entitled to Vote

Only a Holder of a Claim classified in an Impaired Class is entitled to vote on the Plan. Under Section 1124 of the Bankruptcy Code, a Class of Claims or Interests is "impaired" by the Plan if the legal, equitable or contractual rights attaching to the Claims or Interests of that Class are modified. Modification for purposes of determining impairment, however, does not include the curing of defaults and the reinstating of maturity.

In order to have a Claim entitled to vote, a Claimant must have (1) timely filed a Proof of Claim or (2) if no Proof of Claim was filed, been listed in the Schedules as having a Claim that is not contingent, unliquidated or disputed. If such a Claim was scheduled as contingent, unliquidated or disputed, and if Claimant does not file proof of such Claim on or before the Bar Date, or if such Claim is the subject of an objection, Claimant does not have a Claim, entitled to vote, and will not participate in any Distributions under the Plan until such time as the Claim becomes an Allowed Claim.

The Claims and Interests of the Debtor are divided by the Plan into Classes 1 through 7. The Claims in Classes 1 and 2 are unimpaired. Consequently, the Holders of such Claims and are conclusively presumed to have accepted the Plan and will not be entitled to vote on the Plan. The Claims and Interests in Classes 3 through 7 are impaired and may vote on the Plan.

### 9.2    Impairment Controversies

If a controversy arises as to whether any Claim or Equity Interest, or any Class of Claims or Class of Equity Interests, is Impaired under the Plan, such Claim, Equity Interest, or Class shall be treated as specified in the Plan unless the Bankruptcy Court shall determine such controversy upon motion of the party challenging the characterization of a particular Claim or Equity Interest, or a particular Class of Claims or Class of Equity Interests, under the Plan.

### 9.3    Voting

If a Claim is the subject of an objection or an adversary proceeding prior to the deadline for submission of votes and the Holder of the Claim has not filed a motion seeking relief under

Rule 3018 of the Bankruptcy Rules, the Holder shall not be entitled to vote to accept or reject the Plan.

### 9.4    Voting Instructions

Each Holder of an Allowed Claim or Interest in a voting Class may cast its vote to accept or reject the Plan by completing, dating, signing and returning the Ballot accompanying this Disclosure Statement to:

> **Valmiera Glass Ballot Processing Center**
> **c/o KCC**
> **222 N. Pacific Coast Hwy., Ste. 300**
> **El Segundo, CA 90245**

**With a copy to:**

> **Ashley R. Ray, Esq.**
> **Scroggins & Williamson, P.C.**
> **4401 Northside Parkway**
> **Suite 450**
> **Atlanta, Georgia 30327**

Any Ballot received which does not indicate either an acceptance or rejection of the Plan shall be deemed to constitute an acceptance of the Plan.  Ballots submitted by facsimile will not be accepted.  A Ballot shall not constitute a Proof of Claim or Proof of Interest or an amendment to a Proof of Claim or Proof of Interest.

If a Creditor has a Claim in more than one Class under the Plan, that Creditor should receive a separate Ballot for each such claim.  If Claimant needs additional Ballots, or believes it has a Claim that is in Classes 3 through 7 and did not receive a Ballot, please contact the Debtor's counsel, Ashley R. Ray, at the address set forth above, sufficiently in advance of the Voting Deadline to obtain the Ballot and return the Ballot before the Voting Deadline.

### 9.5    Requirements of Confirmation

The Bankruptcy Court will confirm the Plan only if it determines that all of the requirements of the Bankruptcy Code have been met.  The Bankruptcy Code requires, among other things, that (i) the Plan be accepted by at least one impaired Class, (ii) the Bankruptcy Court make a determination that the Plan is in the "best interests" of all Holders of Claims and Interests (that is, dissenting Creditors and certain Interest Holders will receive at least as much under the Plan as they would receive in a liquidation under Chapter 7 of the Bankruptcy Code), (iii) the Bankruptcy Court make a determination that the Plan is feasible, and (iv) the Plan has classified Claims and Interests in a permissible manner.  In order to confirm the Plan, the Bankruptcy Court must find that all of these and certain other requirements have been met.  Thus, even if the requisite vote is achieved for each impaired Class, the Bankruptcy Court must make independent findings regarding the Plan's conformity with these requirements of the Bankruptcy Code before it may confirm the Plan.  Additionally, if the requisite vote will not be achieved for each impaired Class, the Bankruptcy Court must also make independent findings regarding the Plan's conformity with the requirements

of Section 1129(b) of the Bankruptcy Code. The various statutory requirements are discussed below.

### (a)  Acceptance by at Least One Impaired Class

In order for the Plan to be confirmed, the Plan must be accepted by at least one impaired Class that is entitled to vote on the Plan. A Class of Impaired Claims will have accepted the Plan if at least two-thirds in amount and more than one-half in number of the Claims actually voting in the Class have accepted it.

### (b)  Best Interests Test

The Plan cannot be confirmed unless the Bankruptcy Court determines that the Plan is in the "best interests" of the Debtor's Creditors and Interest Holders. The Plan will be deemed to have satisfied the "best interests" test if the Plan provides to each dissenting or nonvoting member of each impaired Class a recovery that has a value that is at least equal to the distribution that such member would receive if the assets of the Debtor were liquidated on the Effective Date in a hypothetical case under Chapter 7 of the Bankruptcy Code by a Chapter 7 trustee. If all members of an impaired Class of Claims or Equity Interest Holders vote to accept the Plan, the "best interests" test does not apply with respect to that Class.

In applying the "best interests" test, the Bankruptcy Court would ascertain the hypothetical recoveries in a Chapter 7 liquidation to the Debtor's Creditors and Interest Holders. These hypothetical Chapter 7 liquidation recoveries would then be compared with the distributions offered to each impaired Class of Claims or Interests under the Plan in order to determine if the Plan satisfies the "best interests" test.

In applying the "best interests" test, it is likely that Claims and Interests in the Chapter 7 case would not be classified in the same manner that such Claims and Interests are classified under the Plan. In the absence of a contrary determination by the Bankruptcy Court, all pre-bankruptcy Unsecured Claims which have the same rights upon liquidation would be treated as one Class for the purposes of determining the potential distribution of the liquidation proceeds resulting from the Debtor's Chapter 7 case. The distributions from the liquidation proceeds would be calculated ratably according to the amount of the Claim held by each Creditor. The Debtor, as Plan Proponent, believes that the most likely outcome of liquidation proceedings under Chapter 7 would be the application of the rule of absolute priority of distributions. Under that rule, no junior Creditor receives any distribution until the Allowed Claims of all senior Creditors are paid in full, and no Equity Interest Holder receives any distribution until the Allowed Claims of all Creditors are paid in full.

As discussed in more detail in Article XII of this Disclosure Statement, the Debtor's analysis indicates that confirmation of the Plan will provide each Creditor and Interest Holder holding a Claim or Interest in an impaired Class with a recovery that is at least equal to the recovery that such Creditor or Interest Holder would receive pursuant to a liquidation and distribution of the Assets under Chapter 7 of the Bankruptcy Code.

**(c)   Feasibility of the Plan**

In order for the Plan to be confirmed, the Bankruptcy Court must determine that the Plan is feasible; that is, as a practical matter, that the Debtor will be able to meet its obligations under the Plan on a timely basis and according to its terms. The Debtor believes that the Plan is feasible as a liquidating plan.

**(d)   Classification of Claims**

The Debtor believes that the Plan meets the classification requirements of the Bankruptcy Code, which require that a Plan of Liquidation place each Claim or Interest in a Class with other Claims or Interests that are "substantially similar."

**9.6   Additional Requirements of Section 1129(b) of the Bankruptcy Code**

In the event the Plan does not satisfy the requirements of Section 1129(a) of the Bankruptcy Code, the Debtor will seek confirmation of the Plan pursuant to the so-called "cramdown" provisions of Section 1129(b) of the Bankruptcy Code.  Pursuant to Section 1129(b), the Bankruptcy Court must determine whether the Plan is fair and equitable and does not discriminate unfairly against each impaired Class of Claims or Interests that has not accepted the Plan.  The Plan will not discriminate unfairly if no Class receives more than it is legally entitled to receive for its Claims.  "Fair and equitable" has different meanings for Secured Claims, Unsecured Claims and Equity Interests.

With respect to a Secured Claim, "fair and equitable" means either (i) the impaired Secured Creditor retains its liens to the extent of its Allowed Secured Claim and receives deferred Cash payments at least equal to the allowed amount of its Claim with a present value as of the Effective Date of the Plan at least equal to the value of its interest in the property securing its liens, (ii) if property subject to the lien of the impaired Secured Creditor is sold free and clear of its lien, the impaired Secured Creditor receives a lien attaching to the proceeds of the sale, or (iii) the impaired Secured Creditor realizes the "indubitable equivalent" of its Claim under the Plan.  Under certain circumstances, a Secured Creditor is entitled under Section 1111(b) of the Bankruptcy Code to elect to have its entire Claim, including any deficiency, treated as a Secured Claim.

With respect to an Unsecured Claim, "fair and equitable" means either (i) the impaired Unsecured Creditor receives property of a value equal to the amount of its Allowed Claim, or (ii) the Holders of Claims or Interests that are junior to the Claims of the dissenting Class will not receive any property under the Plan.

With respect to a Class of Equity Interests, "fair and equitable" means either (i) each Holder of an Interest of such Class receives or retains on account of such Interest property with a value equal to the greater of the allowed amount of any fixed liquidation preference to which such Holder is entitled, any fixed redemption price to which such Holder is entitled or the value of such Interest, or (ii) the Holder of any Interest that is junior to the Interests of such Class will not receive or retain any property on account of such junior Interest.

The Debtor believes the Plan meets the fair and equitable test with respect to each Holder of an impaired Claim or Interest.

- 36 -

**9.7     Objections to Confirmation**

As will be set forth in the Order Approving Disclosure Statement and Notice of Confirmation Hearing, any objections to confirmation of the Plan must be in writing, must set forth the objector's standing to assert any such objection, and must be filed with the Bankruptcy Court and served on counsel for the Debtor, counsel for the Bank and counsel for the Committee.  The Order Approving Disclosure Statement and Notice of Confirmation of Hearing will contain all relevant procedures relating to the submission of objections to confirmation and should be reviewed in its entirety by any party who has an objection to confirmation.

**9.8     Confirmation of Plan Without Acceptance of All Impaired Classes**

Even if one or more impaired Classes do not vote to accept the Plan, the Bankruptcy Court may, pursuant to Section 1129(b) of the Bankruptcy Code, confirm the Plan without the acceptance of all impaired Classes.  Confirmation under Section 1129(b) requires that the Plan be fair and equitable with respect to each impaired Class of Claims that has not accepted the Plan.  The Plan proponents reserve their right to seek Confirmation of the Plan under Section 1129(b) if one or more Classes of Impaired Claims does not accept or is deemed not to have accepted the Plan.

**9.9     Hearing on Confirmation of the Plan**

Section 1128 of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan.  At that time, the Debtor will present the results of the vote by each impaired Class of Creditors entitled to vote in favor of or in opposition to the Plan.  The Bankruptcy Court will consider whether the requirements for confirmation of the Plan under the Bankruptcy Code have been satisfied, as well as any objections to the Plan that are timely filed.  Any Creditor may object to the confirmation of the Plan, regardless of whether it is entitled to vote on the Plan.

**ARTICLE X**
**DISCHARGE, RELEASE, LIMITATIONS OF LIABILITY,**
**AND GENERAL INJUNCTION**

**ARTICLE VII OF THE PLAN CONTAINS CERTAIN PROVISIONS, DESCRIBED BELOW, WHICH, AMONG OTHER THINGS: (A) ENJOIN CREDITORS HOLDING CLAIMS AGAINST THE DEBTOR FROM COMMENCING OR CONTINUING ANY ACTION OR PROCEEDING ASSERTING SUCH CLAIMS AGAINST THE DEBTOR, THE ESTATE OR THE LIQUIDATING TRUST OTHER THAN TO ENFORCE RIGHTS UNDER THE PLAN; (B) EXCULPATE AND RELEASE THE DEBTOR, ITS OFFICERS AND PROFESSIONALS, AND THE COMMITTEE, ITS MEMBERS AND PROFESSIONALS, FROM LIABILITY FOR ACTS OR OMISSIONS IN CONNECTION  WITH THE DEBTOR, THE DEBTOR'S PROPERTY, THE DEBTOR'S BUSINESS, THE CASE OR THE PLAN, OTHER THAN ARISING FROM FRAUD, WILLFUL MISCONDUCT OR GROSS NEGLIGENCE; (C)  RELEASE AND ENJOIN THE ASSERTION OF CLAIMS AND CAUSES OF ACTION AGAINST THE INSIDER RELEASED PARTIES WHICH ARISE FROM OR RELATE TO THE DEBTOR, THE CASE, ANY PROPERTY OF THE DEBTOR, THE BUSINESS OR**

OPERATIONS OF THE DEBTOR, ANY PLAN DOCUMENTS, THE PLAN, OR ANY OF THE TRANSACTIONS CONTEMPLATED THEREBY; AND (D)  RELEASE AND ENJOIN THE ASSERTION OF CLAIMS AND CAUSES OF ACTION AGAINST THE BANK WHICH ARISE FROM OR RELATE TO THE DEBTOR, THE CASE, ANY PROPERTY OF THE DEBTOR, THE BUSINESS OR OPERATIONS OF THE DEBTOR, ANY PLAN DOCUMENTS, THE PLAN, OR ANY OF THE TRANSACTIONS CONTEMPLATED THEREBY.  THESE PROVISIONS ARE NECESSARY FOR THE SUCCESS OF THE PLAN AND ARE FAIR AND EQUITABLE UNDER ALL THE FACTS AND CIRCUMSTANCES.  IN FACT, ABSENT THE RELEASES AND INJUNCTIVE RELIEF PROVIDED FOR THE INSIDER RELEASED PARTIES AND THE BANK, THE DEBTOR WOULD BE UNABLE TO MOVE FORWARD WITH A CHAPTER 11 PLAN AT THIS TIME.  IN SUCH EVENT, AS DISCUSSED IN MORE DETAIL AT ARTICLE XII BELOW, ANY RECOVERY IN THIS CASE FOR THE HOLDERS OF UNSECURED CLAIMS WOULD BE HIGHLY UNCERTAIN AND WOULD ONLY COME FOLLOWING SUBSTANTIAL DELAY AND LITIGATION EXPENSE THAT WOULD REDUCE FURTHER THE ULTIMATE RETURN TO CREDITORS.

10.1    General Injunction

PURSUANT TO SECTIONS 105, 1123, 1129 AND 1141 OF THE BANKRUPTCY CODE, IN ORDER TO PRESERVE AND IMPLEMENT THE VARIOUS TRANSACTIONS CONTEMPLATED BY AND PROVIDED FOR IN THE PLAN, AS OF THE EFFECTIVE DATE AND THROUGH THE CONSUMMATION DATE, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR IN THE CONFIRMATION ORDER, ALL PERSONS OR ENTITIES THAT HAVE HELD, CURRENTLY HOLD OR MAY HOLD A CLAIM, DEBT, OR LIABILITY AGAINST THE DEBTOR, THE ESTATE OR ANY OF THEIR RESPECTIVE PROPERTY, ARE AND SHALL BE ENJOINED AND BARRED TO THE FULLEST EXTENT PERMITTED BY LAW FROM TAKING ANY OF THE FOLLOWING ACTIONS ON ACCOUNT OF ANY SUCH CLAIMS, DEBTS, OR LIABILITIES, OTHER THAN ACTIONS BROUGHT TO ENFORCE ANY RIGHTS OR OBLIGATIONS UNDER THE PLAN OR THE PLAN DOCUMENTS:    (A) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING AGAINST THE LIQUIDATION TRUST, THE DEBTOR, THE ESTATE, OR THEIR RESPECTIVE PROPERTY; (B) ENFORCING, ATTACHING, COLLECTING OR RECOVERING IN ANY MANNER ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST THE LIQUIDATING TRUST, THE DEBTOR, THE ESTATE, OR THEIR RESPECTIVE PROPERTY; (C) CREATING, PERFECTING OR ENFORCING ANY LIEN OR ENCUMBRANCE AGAINST THE LIQUIDATING TRUST, THE DEBTOR, THE ESTATE, OR THEIR RESPECTIVE PROPERTY; (D) ASSERTING A SETOFF, RIGHT OF SUBROGATION OR RECOUPMENT OF ANY KIND AGAINST ANY DEBT, LIABILITY OR OBLIGATION DUE TO THE LIQUIDATING TRUST, THE DEBTOR OR THE ESTATE; (E) COMMENCING OR CONTINUING, IN ANY MANNER OR IN ANY PLACE, ANY ACTION THAT DOES NOT COMPLY WITH OR IS INCONSISTENT WITH THE PROVISIONS OF THE PLAN OR THE CONFIRMATION ORDER; OR (F) INTERFERING WITH OR IN ANY MANNER WHATSOEVER DISTURBING THE RIGHTS AND REMEDIES OF THE LIQUIDATING TRUST, THE DEBTOR OR THE ESTATE UNDER THE PLAN AND THE PLAN DOCUMENTS AND

THE OTHER DOCUMENTS EXECUTED IN CONNECTION THEREWITH. THE LIQUIDATING TRUSTEE SHALL HAVE THE RIGHT TO INDEPENDENTLY SEEK ENFORCEMENT OF THIS GENERAL INJUNCTION PROVISION. THIS GENERAL INJUNCTION PROVISION IS AN INTEGRAL PART OF THE PLAN AND IS ESSENTIAL TO ITS IMPLEMENTATION. NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN OR IN THE PLAN, THE PROVISIONS OF ARTICLE VII, SECTION 7.01 OF THE PLAN SHALL NOT RELEASE, OR BE DEEMED A RELEASE OF, ANY OF THE CAUSES OF ACTION.

    **10.2**    **Exculpation From Liability**

THE DEBTOR, ITS CURRENT OFFICERS, AND ITS PROFESSIONALS (ACTING IN SUCH CAPACITY), THE COMMITTEE AND ITS PROFESSIONALS (ACTING IN SUCH CAPACITY), THE MEMBERS OF THE COMMITTEE AND THEIR PROFESSIONALS (ACTING IN SUCH CAPACITY), AND THE BANK AND ITS PROFESSIONALS (ACTING IN SUCH CAPACITY) (COLLECTIVELY, THE "EXCULPATED PARTIES") SHALL NEITHER HAVE NOR INCUR ANY LIABILITY WHATSOEVER TO ANY PERSON OR ENTITY FOR ANY ACT TAKEN OR OMITTED TO BE TAKEN IN GOOD FAITH IN CONNECTION WITH OR RELATED TO THE FORMULATION, PREPARATION, DISSEMINATION, OR CONFIRMATION OF THE PLAN, THE DISCLOSURE STATEMENT, ANY PLAN DOCUMENT, OR ANY CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO, OR ANY OTHER ACT TAKEN OR OMITTED TO BE TAKEN, IN CONNECTION WITH THE PLAN OR THE CASE, IN EACH CASE FOR THE PERIOD ON AND AFTER THE PETITION DATE AND THROUGH THE EFFECTIVE DATE; PROVIDED, HOWEVER, THAT THIS EXCULPATION FROM LIABILITY PROVISION SHALL NOT BE APPLICABLE TO ANY LIABILITY FOUND BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED FROM FRAUD OR THE WILLFUL MISCONDUCT OR GROSS NEGLIGENCE OF ANY SUCH PARTY. THE RIGHTS GRANTED UNDER ARTICLE VII, SECTION 7.02 OF THE PLAN ARE CUMULATIVE WITH (AND NOT RESTRICTIVE OF) ANY AND ALL RIGHTS, REMEDIES, AND BENEFITS THAT THE EXCULPATED PARTIES HAVE OR OBTAIN PURSUANT TO ANY PROVISION OF THE BANKRUPTCY CODE OR OTHER APPLICABLE LAW. IN FURTHERANCE OF THE FOREGOING, THE EXCULPATED PARTIES SHALL HAVE THE FULLEST PROTECTION AFFORDED UNDER SECTION 1125(E) OF THE BANKRUPTCY CODE AND ALL APPLICABLE LAW FROM LIABILITY FOR VIOLATION OF ANY APPLICABLE LAW, RULE OR REGULATION GOVERNING THE SOLICITATION OF ACCEPTANCE OR REJECTION OF A PLAN OR THE OFFER, ISSUANCE, SALE OR PURCHASE OF SECURITIES. THIS EXCULPATION FROM LIABILITY PROVISION IS AN INTEGRAL PART OF THE PLAN AND IS ESSENTIAL TO ITS IMPLEMENTATION. NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, THE PROVISIONS OF ARTICLE VII, SECTION 7.02 OF THE PLAN SHALL NOT RELEASE, OR BE DEEMED A RELEASE OF, ANY OF THE CAUSES OF ACTION.

**10.3    Release of Exculpated Parties**

ON THE EFFECTIVE DATE, THE EXCULPATED PARTIES SHALL BE UNCONDITIONALLY AND ARE HEREBY DEEMED TO BE UNCONDITIONALLY RELEASED FROM ANY AND ALL CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, LOSSES, RIGHTS, REMEDIES, CAUSES OF ACTION, CHARGES, COSTS, DEBTS, INDEBTEDNESS, OR LIABILITIES WHATSOEVER, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREAFTER ARISING, IN LAW, EQUITY OR OTHERWISE, BASED IN WHOLE OR IN PART UPON ANY ACT OR OMISSION, TRANSACTION, EVENT OR OTHER OCCURRENCE TAKING PLACE BETWEEN THE PETITION DATE AND THE EFFECTIVE DATE, WHICH IS IN ANY WAY RELATING TO THE DEBTOR, THE CASE, ANY PROPERTY OF THE DEBTOR, THE BUSINESS OR OPERATIONS OF THE DEBTOR, ANY PLAN DOCUMENTS, THE PLAN, OR ANY OF THE TRANSACTIONS CONTEMPLATED THEREBY; PROVIDED, HOWEVER, THAT THIS RELEASE PROVISION SHALL NOT BE APPLICABLE TO ANY LIABILITY FOUND BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED FROM FRAUD OR THE WILLFUL MISCONDUCT OR GROSS NEGLIGENCE OF ANY SUCH EXCULPATED PARTY. THE CONFIRMATION ORDER SHALL ENJOIN THE PROSECUTION BY ANY PERSON OR ENTITY, WHETHER DIRECTLY, DERIVATIVELY OR OTHERWISE, OF ANY CLAIM, OBLIGATION, SUIT, JUDGMENT, DAMAGE, LOSS, RIGHT, REMEDY, CAUSE OF ACTION, CHARGE, COST, DEBT, INDEBTEDNESS, OR LIABILITY WHICH AROSE OR ACCRUED DURING SUCH PERIOD OR WAS OR COULD HAVE BEEN ASSERTED AGAINST ANY OF THE EXCULPATED PARTIES, EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR IN THE CONFIRMATION ORDER. EACH OF THE EXCULPATED PARTIES SHALL HAVE THE RIGHT TO INDEPENDENTLY SEEK ENFORCEMENT OF THIS RELEASE PROVISION. THIS RELEASE PROVISION IS AN INTEGRAL PART OF THE PLAN AND IS ESSENTIAL TO ITS IMPLEMENTATION. NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, THE PROVISIONS OF ARTICLE VII, SECTION 7.03 OF THE PLAN SHALL NOT RELEASE, OR BE DEEMED A RELEASE OF, ANY OF THE CAUSES OF ACTION.

**10.4    Release of Non-Objecting Insiders**

IN EXCHANGE FOR THE CONSIDERATION BEING PROVIDED UNDER THE PLAN BY THE INSIDER RELEASED PARTIES, AS OF THE EFFECTIVE DATE ALL INSIDER RELEASED PARTIES SHALL BE UNCONDITIONALLY AND ARE HEREBY DEEMED TO BE UNCONDITIONALLY RELEASED FROM ANY AND ALL CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, LOSSES, RIGHTS, REMEDIES, CAUSES OF ACTION, CHARGES, COSTS, DEBTS, INDEBTEDNESS, OR LIABILITIES WHATSOEVER, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREAFTER ARISING, IN LAW, EQUITY OR OTHERWISE, BASED IN WHOLE OR IN PART UPON ANY ACT OR OMISSION, TRANSACTION, EVENT OR OTHER OCCURRENCE TAKING PLACE PRIOR TO THE EFFECTIVE DATE, WHICH IS IN ANY WAY RELATING TO THE DEBTOR, THE CASE, ANY PROPERTY OF THE DEBTOR, THE BUSINESS OR OPERATIONS OF THE

DEBTOR, ANY PLAN DOCUMENTS, THE PLAN, OR ANY OF THE TRANSACTIONS CONTEMPLATED THEREBY.  THE CONFIRMATION ORDER SHALL ENJOIN THE PROSECUTION BY ANY PERSON OR ENTITY, WHETHER DIRECTLY, DERIVATIVELY OR OTHERWISE, OF ANY CLAIM, OBLIGATION, SUIT, JUDGMENT, DAMAGE, LOSS, RIGHT, REMEDY, CAUSE OF ACTION, CHARGE, COST, DEBT, INDEBTEDNESS, OR LIABILITY WHICH AROSE OR ACCRUED DURING SUCH PERIOD OR WAS OR COULD HAVE BEEN ASSERTED AGAINST ANY OF THE INSIDER RELEASED PARTIES, EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR IN THE CONFIRMATION ORDER.  EACH OF THE INSIDER RELEASED PARTIES SHALL HAVE THE RIGHT TO INDEPENDENTLY SEEK ENFORCEMENT OF THIS RELEASE PROVISION.  THIS RELEASE PROVISION IS AN INTEGRAL PART OF THE PLAN AND IS ESSENTIAL TO ITS IMPLEMENTATION. NOTHING IN THE FOREGOING SHALL RESULT IN ANY CURRENT DIRECTORS AND OFFICERS OF THE DEBTOR WAIVING ANY INDEMNIFICATION CLAIMS AGAINST THE DEBTOR OR ANY OF ITS INSURANCE CARRIERS OR ANY RIGHTS AS BENEFICIARIES OF ANY INSURANCE POLICIES.

### 10.5    Release of Bank

IN EXCHANGE FOR THE CONSIDERATION BEING PROVIDED UNDER THE PLAN BY THE BANK, AS OF THE EFFECTIVE DATE THE BANK SHALL BE UNCONDITIONALLY AND IS HEREBY DEEMED TO BE UNCONDITIONALLY RELEASED FROM ANY AND ALL CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, LOSSES, RIGHTS, REMEDIES, CAUSES OF ACTION, CHARGES, COSTS, DEBTS, INDEBTEDNESS, OR LIABILITIES WHATSOEVER, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREAFTER ARISING, IN LAW, EQUITY OR OTHERWISE, BASED IN WHOLE OR IN PART UPON ANY ACT OR OMISSION, TRANSACTION, EVENT OR OTHER OCCURRENCE TAKING PLACE PRIOR TO THE EFFECTIVE DATE, WHICH IS IN ANY WAY RELATING TO THE DEBTOR, THE CASE, ANY PROPERTY OF THE DEBTOR, THE BUSINESS OR OPERATIONS OF THE DEBTOR, ANY PLAN DOCUMENTS, THE PLAN, OR ANY OF THE TRANSACTIONS CONTEMPLATED THEREBY. THE CONFIRMATION ORDER SHALL ENJOIN THE PROSECUTION BY ANY PERSON OR ENTITY, WHETHER DIRECTLY, DERIVATIVELY OR OTHERWISE, OF ANY CLAIM, OBLIGATION, SUIT, JUDGMENT, DAMAGE, LOSS, RIGHT, REMEDY, CAUSE OF ACTION, CHARGE, COST, DEBT, INDEBTEDNESS, OR LIABILITY WHICH AROSE OR ACCRUED DURING SUCH PERIOD OR WAS OR COULD HAVE BEEN ASSERTED AGAINST THE BANK, EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR IN THE CONFIRMATION ORDER.    THE BANK SHALL HAVE THE RIGHT TO INDEPENDENTLY SEEK ENFORCEMENT OF THIS RELEASE PROVISION.  THIS RELEASE PROVISION IS AN INTEGRAL PART OF THE PLAN AND IS ESSENTIAL TO ITS IMPLEMENTATION

### 10.6    Barton Doctrine

The "Barton Doctrine," *e.g. Barton v. Barbour*, 104 U.S. 126, 26 L.Ed. 672 (1881) (Supreme Court held that a trustee cannot be sued without leave of the bankruptcy court), which

prohibits a party from suing either a trustee, the officers of a debtor in possession, or their attorneys, in a non-appointing court for acts done in their official capacity, shall pertain to the provisions of Article VII of the Plan, and shall stand as one of the bases for enforcement of those provisions. *See, e.g., Carter v. Rodgers*, 220 F.3d 1249, 1252 (11th Cir. 2000)(" [j]oining the other circuits that have considered this issue, we hold that a debtor must obtain leave of the bankruptcy court before initiating an action in district court when that action is against the trustee or other bankruptcy-court-appointed officer, for acts done in the actor's official capacity"); *Patco Energy Express v. Lambros*, 2009 U.S. App. LEXIS 25771 (11th Cir. 2009) ("[w]here a plaintiff neglects to obtain leave from the appointing court, a suit filed [against a bankruptcy trustee] in another court must be dismissed for lack of subject matter jurisdiction"); *In the Matter of Linton*, 136 F.3d 544, 545 (7th Cir. 1998); *In re DeLorean Motor Co.*, 991 F.2d 1236, 1240-41 (6th Cir. 1993) ("[i]t is well settled that leave of the appointing forum must be obtained by any party wishing to institute an action in a nonappointing forum against a trustee, for acts done in the trustee's official capacity and within the trustee's authority as an officer of the court .... counsel for trustee, court appointed officers who represent the estate, are the functional equivalent of a trustee"); *In re Balboa Improvements, Ltd.*, 99 B.R. 966, 970 (9th Cir. BAP 1989) (holding that permission to sue debtor's attorney for alleged misconduct in the administration of an estate must be obtained from the bankruptcy court.

### 10.7   Continuation of Automatic Stay

The automatic stay arising out of Section 362(a) of the Bankruptcy Code shall continue in full force and effect until the Consummation Date, and the Debtor, the Post-Effective Date Debtor, the Estate, the Liquidating Trustee and the Liquidating Trust shall be entitled to all of the protections afforded thereby.  The Court shall have the power to grant such additional and supplemental stays as may be necessary or appropriate to protect and preserve the Assets of the Debtor, the Estate and/or the Liquidating Trust or to permit the just and orderly administration of the Estate.

### 10.8   No Liability for Tax Claims

Unless a taxing Governmental Authority has asserted a Claim against the Debtor before the Bar Date, the Initial Administrative Expense Claim Bar Date or the Final Administrative Expense Claim Bar Date, as applicable, no Claim of such Governmental Authority shall be Allowed against the  Debtor, the Estate, the Liquidating Trust, the Liquidating Trustee, or their directors, officers, employees or agents for taxes, penalties, interest, additions to tax or other charges arising out of (i) the failure, if any, of the Debtor, or any other Person or Entity to have paid tax or to have filed any tax return (including any income tax return or franchise tax return) in or for any prior year or period, or (ii) an audit of any return for a period before the Petition Date. The entry of the Confirmation Order shall be deemed to be a determination that no provision of the Plan has avoidance of taxes as a principal purpose, and the Confirmation Order shall so provide.

### 10.9   Regulatory or Enforcement Actions

Nothing in the Plan shall restrict any federal government regulatory agency from pursuing any regulatory or police enforcement action or performing its statutory duties against any Person or Entity in any forum, but only to the extent not prohibited by the automatic stay of Section 362 of the Bankruptcy Code or discharged or enjoined pursuant to Section 524 or 1141(d) of the

Bankruptcy Code. Nothing contained in this Article X, Section 10.9 is intended to, nor shall it, supersede or alter any applicable provisions of the Bankruptcy Code.

**10.10   No Liability for Untimely Administrative Expense Claims**

Holders of Administrative Expense Claims (including Holders of any Claims for Postpetition federal, state or local taxes) that do not file an application or other Bankruptcy Court-approved pleading by the Initial Administrative Expense Claims Bar Date or the Final Administrative Expense Claims Bar Date, as applicable, will be forever barred from asserting such Administrative Expense Claims against the Debtor, its Estate, or any of its Property.

## ARTICLE XI
## FEDERAL TAX CONSIDERATIONS

**11.1   General**

A description of certain U.S. federal income tax consequences of the transactions proposed in the Plan is provided below. This description is based upon the Internal Revenue Code of 1986, as amended (the "**IRC**"), final and temporary Treasury Regulations promulgated thereunder, judicial decisions and administrative determinations of the Internal Revenue Service ("**IRS**") in effect as of the date of this Disclosure Statement. Changes in these authorities, which may have retroactive effect, or new interpretations of existing authority may cause the U.S. federal income tax consequences of the Plan to differ materially from the consequences described below. No rulings have been requested from the IRS and no legal opinions have been requested from counsel with respect to any tax consequences of the Plan. No tax opinion is given by this Disclosure Statement.

The following discussion summarizes certain U.S. federal income tax consequences of the Plan to holders of the Allowed Unsecured Claims. This summary does not address the U.S. federal income tax consequences to holders whose Claims or Equity Interests (i) are paid in full, in cash, or which are otherwise not Impaired under the Plan (i.e., Allowed Administrative Claims, Priority Claims, Priority Tax Claims and Secured Claims) or (ii) that are not receiving any distribution under the Plan.

This description does not cover all aspects of federal income taxation that may be relevant to the Debtor or Holders of Claims. For example, the description provided below does not address issues of special concern to certain types of taxpayers, such as dealers in securities, life insurance companies, financial institutions, tax exempt organizations, foreign taxpayers, investors in pass-through entities, broker dealers and tax-exempt organizations. The description also does not address state, local or foreign tax considerations that may be applicable to the Holders of Claims.

Further, this description assumes that all Holders of Claims are U.S. persons and does not address tax consequences to any holders of Claims that are not U.S. persons. For purposes of this discussion, a U.S. person is any of the following: (i) a citizen or resident of the United States; (ii) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (iii) an estate the income of which is subject to U.S. federal income tax regardless of its source; or (iv)

a trust that (1) is subject to the primary supervision of a U.S. court and the control of one or more U.S. persons or (2) has validly elected to be treated as a U.S. person for U.S. federal income tax purposes.  If a partnership (or other entity taxed as a partnership for U.S. federal income tax purposes) is a holder of a Claim, the tax treatment of a partner in the partnership generally will depend on the status of the partner and upon the activities of the partnership.  Accordingly, partnerships that are holders of Claims are urged to consult their tax advisors regarding the specific U.S. federal income tax consequences to them.

**NO RULING HAS BEEN SOUGHT OR OBTAINED FROM THE IRS WITH RESPECT TO ANY OF THE TAX ASPECTS OF THE PLAN AND NO OPINION OF COUNSEL HAS BEEN OBTAINED BY THE DEBTOR WITH RESPECT THERETO.  NO REPRESENTATION OR ASSURANCE IS BEING MADE WITH RESPECT TO THE FEDERAL INCOME TAX CONSEQUENCES AS DESCRIBED HEREIN.  CERTAIN TYPES OF CLAIMANTS AND INTEREST HOLDERS MAY BE SUBJECT TO SPECIAL RULES NOT ADDRESSED IN THIS SUMMARY OF FEDERAL INCOME TAX CONSEQUENCES.  THERE MAY ALSO BE STATE, LOCAL, OR FOREIGN TAX CONSIDERATIONS APPLICABLE TO EACH HOLDER OF A CLAIM OR EQUITY INTEREST WHICH ARE NOT ADDRESSED HEREIN.  EACH HOLDER OF A CLAIM OR EQUITY INTEREST AFFECTED BY THE PLAN MUST CONSULT AND RELY UPON SUCH HOLDER'S OWN TAX ADVISOR REGARDING THE SPECIFIC TAX CONSEQUENCES OF THE PLAN WITH RESPECT TO SUCH HOLDER'S CLAIM OR EQUITY INTEREST.  THIS INFORMATION MAY NOT BE USED OR QUOTED IN WHOLE OR IN PART IN CONNECTION WITH THE OFFERING FOR SALE OF SECURITIES.**

**IRS CIRCULAR 230 NOTICE:  TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, WE INFORM YOU THAT ANY U.S. FEDERAL TAX ADVICE CONTAINED IN THIS COMMUNICATION IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF (I) AVOIDING PENALTIES UNDER THE INTERNAL REVENUE CODE OR (II) PROMOTING, MARKETING, OR RECOMMENDING TO ANOTHER PARTY ANY TRANSACTION OR MATTER ADDRESSED HEREIN.**

**11.2    Federal Income Tax Consequences To Holders Of Claims**

Assuming the Liquidating Trust is taxed as a "grantor trust" or as a "partnership" for federal income tax purposes, under the Plan, a Holder of a Claim generally will recognize taxable gain or loss to the extent of the difference between the amount realized (i.e., the amount of cash and the value placed on the other assets deemed contributed) by the Holder to the Liquidating Trust in respect of its Claim, excluding accrued interest, and the Holder's tax basis in the Claim, excluding any claim for accrued interest.

The tax character of a Holder's gain or loss as capital or ordinary will be determined by a number of factors, including whether the claimant has a special tax status (such as being a dealer in securities, a financial institution, or an insurance company), or whether the Claim was a capital asset in the hands of the Holder.  In addition, whether the Claim was purchased with original issue discount or market discount could affect the character of any gain or loss that is recognized as

capital or ordinary gain or loss.  Likewise, the basis of such Claim for purposes of determining the amount of any gain or loss recognized on the exchange can be affected by such factors as whether such obligation was purchased with original issue discount, and whether and to what extent the Holder has previously claimed a bad debt deduction with respect to such Claim.

As discussed below, assuming the Liquidating Trust is taxed as a "grantor trust" or as a "partnership" for federal income tax purposes, in the future, each Holder of a Claim will be required to report such Holder's share of the income of the Liquidating Trust.

### 11.3    Tax Treatment of Liquidating Trust and Contribution of Assets

The Liquidating Trust is intended to be treated as a "liquidating trust" pursuant to Treasury Regulation § 301.7701-4(d) and as a "grantor trust" for federal income tax purposes, pursuant to Section 671 through 679 of the Internal Revenue Code of 1986, as amended (the "**IR Code**"). However, no ruling has been sought from the IRS that the Liquidating Trust will meet the standard for classification as a "liquidating trust" and no assurance can be given that the IRS will not disagree with this conclusion that the Liquidating Trust is taxable as a grantor trust for federal income tax purposes.  Assuming the Liquidating Trust is recognized as a grantor trust for federal income tax purposes, the claimants of the Debtor that are beneficiaries of the Liquidating Trust will be treated as the "grantors" of the Liquidating Trust, and the Liquidating Trust will be disregarded for tax purposes as an entity separate from the "grantors."  The grantors will report the income and loss from the Liquidating Trust as if they held their proportionate interest in the assets of the Liquidating Trust, and received the income and paid expenses of the Liquidating Trust, directly (instead of through the Liquidating Trust).  Assuming the Liquidating Trust is a grantor trust, the Liquidating Trust will file annual information returns (a Form 1041, with attached informational statements) with the IRS reporting each "grantor's" respective share of income received and expense paid by the Liquidating Trust.

Accordingly, assuming the Liquidating Trust is recognized as a grantor trust for U.S. federal income tax purposes, the transfer of Cash and any remaining assets of the Debtor to the Liquidating Trust will be treated for U.S. federal income tax purposes as if the Debtor distributed an interest in each of the Assets transferred directly to the Holders of Claims in exchange for their outstanding Claims against or stock of the Debtor.  Each claimant would then be deemed to contribute its interest in these Assets to the Liquidating Trust.  No gain or loss is recognized by a Holder of a Claim on the "deemed" contribution of the interest in these Assets to the Liquidating Trust and the basis in its interest in the Liquidating Trust will equal the aggregate basis in the assets contributed in the Liquidating Trust after taking into account any gain or loss recognized by a Holder of a Claim on the receipt of the interests in these Assets of the Debtor (as discussed above).

If the Liquidating Trust is not treated as a grantor trust for federal income tax purposes, then the Liquidating Trust likely will be classified as a "partnership" for federal income tax purposes (so long as the Liquidating Trust does not make an election to be taxed as a corporation for federal income tax purposes), in which case the creditors of the Debtor that are Beneficiaries of the Liquidating Trust will be treated as "partners" of the "partnership" for federal income tax purposes.  Unlike a grantor trust, the "partnership" would be treated as an entity required to compute income and loss, file tax returns, and make tax elections, but income and loss would pass through to the Beneficiaries of the Liquidating Trust (who are considered "partners" of the

"partnership" for federal income tax purposes) to be reported by them on their separate income tax returns. If the Liquidating Trust is treated as a "partnership" for U.S. federal income tax purposes, the Beneficiaries of the Liquidating Trust will be treated for U.S. federal income tax purposes as if the Debtor had distributed the interests in each of the assets so transferred directly to the Holders of Claims in exchange for their outstanding Claims against or stock of the Debtor and the Holders then contributed the interests in these assets to a "partnership" for federal income tax purposes in exchange for an interest in the "partnership." No gain or loss is recognized upon the deemed exchange of the interests in these Assets for an interest as a "partner" in the "partnership." Each Holder's basis in its interest in the "partnership" will equal the aggregate basis in the assets deemed contributed to the "partnership" after taking into account any gain or loss recognized by a claimant or shareholder on the receipt of the interests in these assets from the Debtor (as discussed above). The partners of the partnership will be required to report their share of income, gain, loss, deduction or credit allocated to them by the partnership. Assuming the Liquidating Trust is a partnership, the Liquidating Trust will file annual returns (a Form 1065, with attached Schedule K-1s for each partner) with the IRS, and issue to each partner a K-1 reporting each "partner's" respective share of income, gain, loss deduction or other item of the Liquidating Trust.

### 11.4    Accrued Interest

To the extent that any amount received by a Holder of a Claim is attributable to accrued but untaxed interest, such amount should be taxable to the Holder as interest income, if such accrued interest has not been previously included in the Holder's gross income for U.S. federal income tax purposes. Conversely, a claimant may be able to recognize a deductible loss for such purposes to the extent that any accrued interest was previously included in the claimant's income, but was not paid in full by the Debtor. The extent to which any consideration received by a Holder under the Plan will be attributable but untaxed interest is unclear. The Debtor will treat the aggregate consideration to be distributed to the claimants as first satisfying the stated principal amount of the Claims with any excess allocated to accrued, but unpaid interest, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a bankruptcy plan is binding for U.S. federal income tax purposes. However, the IRS could take a different view.

### 11.5    Backup Withholding

Under the IRC's backup withholding rules, a Holder of a Claim should be subject to back-up withholding with respect to distributions or payments made pursuant to the Plan unless that Holder (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact or (b) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional income tax, but merely an advance payment of income tax that may be claimed as a credit on the income tax return of the person that is subject to backup withholding and refunded to the extent it results in an overpayment of income tax on such return. Holders of Claims may be required to establish exemption from backup withholding or to make arrangements with respect to the payment of backup withholding.

### 11.6    Not Intended As Tax Advice

THE FOREGOING DISCUSSION IS NOT INTENDED AS TAX ADVICE TO THE DEBTOR'S CREDITORS AND EQUITY HOLDERS REGARDING THE FEDERAL INCOME TAX CONSEQUENCES TO THEM UNDER THE PLAN. THE FOREGOING IS INTENDED TO BE A SUMMARY ONLY. IT IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING OR CONSULTATION WITH A TAX ADVISOR. THE FEDERAL, STATE, LOCAL, AND FOREIGN TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN SOME CASES, UNCERTAIN. SUCH CONSEQUENCES MAY ALSO VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM OR INTEREST. ACCORDINGLY, EACH HOLDER OF A CLAIM OR INTEREST IS STRONGLY URGED TO CONSULT SUCH HOLDER'S OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL, AND FOREIGN TAX CONSEQUENCES OF THE PLAN.

### ARTICLE XII
### LIQUIDATION ANALYSIS

The Debtor as Plan Proponent has analyzed whether a liquidation of its remaining assets by a Chapter 7 Trustee, who is unfamiliar with the Debtor and its Assets, would result in a higher return to the Creditors of the Estate than under the proposed Plan. The Plan proposes a liquidation of the Debtor's remaining Assets by persons, including Professionals, that are already familiar with them. More importantly, the Plan incorporates a number of heavily negotiated settlements which are favorable to the Debtor's Estate and Creditors, including: (a) the WARN Act Class Settlement, (b) settlement of potential Estate claims against the Bank which are the subject of the Committee Standing Motion, and (c) settlement of potential objections to Insider Claims filed and/or scheduled in excess of $91,000,000.

The WARN Act Class Settlement resolves a potential $4.7 million priority wage claim under 11 U.S.C. § 507(a)(4) asserted in the WARN Act Class Action and the WARN Act POC by allowance and payment of the priority WARN Claim in the amount of $887,500, payment of the WARN Net Recovery from Excluded Assets, and allowance of the WARN GUC, in the amount of $1,112,500, as an Unsecured Claim under Class 5.

The settlement under the Plan of the potential claims held by the Estate against the Bank which are the subject of the Committee's Standing Motion will result in no less than $4,821,000 of proceeds of the Bank's collateral being made available under the Plan to fund Confirmation Expenses (up to $3,208,500) and the GUC Amount ($1,612,500). Additionally, the Excluded Assets will be transferred to the Liquidating Trust for the benefit of holders of Liquidating Trust Claim. As part of the settlement with the Bank reflected in the Plan, the Bank is agreeing not to take any distribution from the Liquidating Trust Assets and is also waiving any diminution claims.

Finally, under the Plan it is anticipated that Insiders which have scheduled and/or filed Unsecured Claims in excess of $125,000,000 will agree to the disallowance of those Claims in exchange for the releases and injunctive relief being provided for the Insider Released Parties. Insofar as projected total Unsecured Claims under the Plan ranges from approximately $23 million

to $34 million, these Insider Claims, together with the Bank's potential diminution and deficiency Claims if allowed, would substantially reduce any return to Unsecured Creditors in the Case.

The settlements described above are contingent on Confirmation of the Plan. If the Plan is not confirmed, it is highly doubtful that similar net benefits for the Estate would be obtained through litigation of causes of action and objections to Claims which are being resolved under these settlements. Accordingly, the Debtor has concluded that a Chapter 7 liquidation would likely result in a net return to creditors that is lower than the net return to Creditors that can realistically be realized through the Plan, and, in all likelihood, there would be little or no amounts available for distribution to the holders of Unsecured Claims in Chapter 7. Also, in the event the Debtor is forced to complete its liquidation in Chapter 7, the resulting disruption and uncertainty would almost certainly diminish the value of the Debtor's remaining assets, as the layer of expense occasioned by the appointment of a Chapter 7 Trustee would be more than what is estimated by the Liquidating Trustee under the Plan continuing to retain the Professionals and consultants, who are already familiar with the Claims and other issues facing the Debtor and its Estate. Consequently, for all the foregoing reasons it is believed that the Plan will provide a greater, quicker and more certain return to Creditors than would liquidation of the Debtor's Assets by a Chapter 7 Trustee who is unfamiliar with the Debtor and its assets.

## ARTICLE XIII
## MISCELLANEOUS PLAN PROVISIONS

### 13.1    No Admissions

The Plan provides for the resolution, settlement and compromise of Claims against and Equity Interests in the Debtor. Nothing contained in the Plan or in the Disclosure Statement will be construed to be an admission of any fact or otherwise binding upon the Debtor in any manner prior to the Effective Date.

### 13.2    Revocation or Withdrawal of the Plan

The Plan Proponent reserve the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Plan Proponent revokes or withdraws the Plan, or if Confirmation of the Plan does not occur, then the Plan will be deemed null and void in all respects, and nothing contained in the Plan will be deemed (a) to constitute a waiver or release of any Claims by or against, or Equity Interests in, the Debtor or any other Person, (b) to constitute a waiver or release of any Claims by the Committee, or (c) to prejudice in any manner the rights of the Debtor or any other Person, including the Committee, in any further proceedings involving the Debtor.

### 13.3    Further Actions

Pursuant to Bankruptcy Code Section 1142(b), the Confirmation Order shall act and operate as an order of the Court directing the Debtor, the Liquidating Trustee and/or any other necessary parties to execute and deliver or join in the execution and delivery of any instrument required to affect any transfer and to perform any other act, including the satisfaction of any lien, that is necessary for the consummation of this Plan. Any transfer taxes arising from transfers of

property ordered or made pursuant to this Plan shall be treated in accordance with Section 1146 of the Bankruptcy Code.

### 13.4    Headings

Headings are utilized in the Plan for the convenience of reference only, and shall not constitute a part of the Plan for any other purpose.

### 13.5    Designated Notice Sufficient

Notwithstanding any other provision of the Plan, when notice and a hearing is required with regard to any action to be taken by the Debtor, the Bank or the Liquidating Trustee, Designated Notice shall be sufficient.  With respect to any proposed action to be taken as authorized under the Plan which may only be taken following Designated Notice, the following procedures shall apply.  After Designated Notice of the proposed action has been provided as required under the Plan, if any party in interest files with the Court within ten (10) days of the service of such Designated Notice a written objection to the proposed action, and serves a copy of said objection upon the Debtor, the Bank and the Liquidating Trustee and their counsel, then the Court shall schedule a hearing with respect to such objection and, unless the objection is withdrawn by agreement of the parties, the proposed action may only be taken if approved by Final Order of the Court.  If no objection is timely filed and served, the proposed action may be taken without further authorization or approval by the Court.

### 13.6    Governing Law

Except to the extent that federal law (including the Bankruptcy Code or the Bankruptcy Rules) is applicable, or to the extent that the Plan or a provision of any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan provides otherwise, the rights and obligations arising under the Plan will be governed by, construed, and enforced in accordance with the laws of the State of Georgia, without giving effect to the principles of conflicts of law thereof.

### 13.7    Closing of Case/ Charitable Contribution

The Liquidating Trustee shall be authorized to apply to the Bankruptcy Court for authority to close the Case at any time when the Plan has been substantially consummated or as otherwise appropriate.  If, after all Causes of Action have been resolved and Liquidating Trust Assets liquidated or otherwise administered and the proceeds thereof distributed in accordance with the Plan, including by Distributions, the Liquidating Trustee determines that the expense of administering the Plan is likely to exceed the remaining amount of the Liquidation Proceeds, the Liquidating Trustee shall apply to the Bankruptcy Court for authority to (i) reserve any amounts necessary to close the Bankruptcy Case; (ii) donate any balance to a charitable organization selected by the Liquidating Trustee and which is exempt from federal income tax under Section 501(c)(3) of the Internal Revenue Code; and (iii) close the Bankruptcy Case in accordance with the Bankruptcy Code, the Bankruptcy Rules and the Local Rules.  These provisions shall apply without regard to any applicable non-bankruptcy laws with respect to unclaimed property.  Any Creditor, the Liquidating Trustee or the Debtor may petition to reopen the Case at any time within the seven (7) year period immediately following the Effective Date of the Plan for the purpose of

having the Bankruptcy Court interpret any provision of the Plan or enforce the rights of any party under the Plan or under the Bankruptcy Code.

**ARTICLE XIV**
**RETENTION OF JURISDICTION**

The Bankruptcy Court shall retain jurisdiction, notwithstanding entry of the Confirmation Order and notwithstanding the occurrence of the Effective Date of the Plan, for the following purposes:

**(a)**    to enforce all causes of action which exist on behalf of the Debtor pursuant to the provisions of this Plan or applicable law;

**(b)**    to enter orders and injunctions and restraints to enforce the provisions of the Plan;

**(c)**    to determine claims asserted under Section 507(a)(2) of the Bankruptcy Code, including claims for compensation and reimbursement of expenses accruing prior to the Confirmation Date;

**(d)**    to determine any Disputed Claims or disputes concerning the validity of or the market value of any collateral underlying any Secured Claim;

**(e)**    to enter orders regarding interpretation of the Plan, or any document created in connection with the Plan, or any disputes with respect thereto;

**(f)**    to conduct hearings and to enter orders modifying the Plan as provided herein or in the Bankruptcy Code;

**(g)**    to determine any and all applications, claims, adversary proceedings, and contested or litigated matters pending on the Confirmation Date;

**(h)**    to determine any applications for rejection or assumption of executory contracts or leases, and to determine Claims resulting from rejection of executory contracts and leases;

**(i)**    to allow or disallow, and estimate, liquidate, or determine any Claims against the Debtor arising on or before the Effective Date, including tax claims, but excluding any Claims deemed Allowed by this Plan, and to enter or enforce any order requiring the filing of any such Claim before a particular date; and

**(j)**    to enter orders required for the administration of the Plan, including, but not limited to:

        **(i)**    resolution of disputes pertaining to the amounts of payments under the Plan to Claimants;

        **(ii)**    conducting post-confirmation valuation hearings as required by the Plan or authorized by the Bankruptcy Code; and

**(iii)** exercising jurisdiction over any other matter provided for or consistent with the provisions of Chapter 11 of the Bankruptcy Code.

## ARTICLE XV
## MODIFICATIONS AND AMENDMENTS

The Debtor reserves the right, pursuant to Section 1127(a) of the Bankruptcy Code, to amend or modify the Plan prior to the Confirmation of the Plan; provided, however, that no material amendment or modification to the Plan shall be made without the consent of the Bank and the Committee; and provided further, that no amendment or modification to the Liquidating Trust Agreement shall be made without the written consent of the Committee. The Plan may be modified, without notice or hearing, or on such notice and hearing as the Court deems appropriate, if the Court finds that the proposed modification does not materially and adversely affect the rights of any parties in interest which have not had notice and an opportunity to be heard with regard to the proposed modification. Without limiting the foregoing, the Plan otherwise may be modified after notice and hearing. In the event of modification at or before Confirmation, any votes in favor of the Plan shall be deemed to be votes in favor of the Plan as modified, unless the Court finds that the proposed modification materially and adversely affects the rights of the parties in interest that cast such votes. After Confirmation of the Plan, the Debtor and/or the Liquidating Trustee, as applicable, reserve the right to modify the Plan as allowed by Section 1127(b) of the Bankruptcy Code, and applicable law.

## ARTICLE XVI
## CONCLUSION

The Debtor and the Committee urge all Holders of Claims to accept the Plan because the Debtor and the Committee believe the Plan will provide each such Holder more than it would receive pursuant to any alternative plan of liquidation or under Chapter 7 of the Bankruptcy Code. Accordingly, the Debtor and the Committee urge all eligible members of Voting Classes to submit Ballots in favor of the Plan in accordance with the balloting procedures described herein.

This 10th day of September, 2020.

P-D VALMIERA GLASS USA, CORP.

By: /s/ Joeran Pfuhl
Its: Chief Executive Officer

By: /s/ Benjamin Deubel
Its: Chief Financial Officer

SCROGGINS & WILLIAMSON, P.C.

 /s/ Ashley R. Ray
J. ROBERT WILLIAMSON
Georgia Bar No. 765214
ASHLEY REYNOLDS RAY
Georgia Bar No. 601559
MATTHEW W. LEVIN
Georgia Bar No. 448270
One Riverside
4401 Northside Parkway
Suite 450
Atlanta, GA 30327
404.893.3880

Counsel for the Debtor

## **Exhibit 1**

Plan of Liquidation

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this day served a true and correct copy of the attached

**DISCLOSURE STATEMENT TO ACCOMPANY PLAN OF LIQUIDATION** by causing it to be deposited

in the United States Mail in a properly addressed envelope with adequate postage affixed thereon

to the following:

OFFICE OF THE UNITED STATES TRUSTEE
362 Richard Russell Building
75 Ted Turner Drive, SW
Atlanta, GA 30303

Gary W. Marsh, Esq.
TROUTMAN PEPPER HAMILTON SANDERS, LLP
600 Peachtree Street, N.E.
Suite 3000
Atlanta, GA 30308

Todd C. Meyers
Colin M. Bernardino, Esq.
KILPATRICK TOWNSEND & STOCKTON, LLP
1100 Peachtree Street, NE
Suite 2800
Atlanta, GA 30309-4530

This 10th day of September, 2020.

Respectfully submitted,

SCROGGINS & WILLIAMSON, P.C.

4401 Northside Parkway
Suite 450
Atlanta, GA 30327
T: (404) 893-3880
F: (404) 893-3886
E: rwilliamson@swlawfirm.com
   aray@swlawfirm.com

  /s/ J. Robert Williamson
J. ROBERT WILLIAMSON
Georgia Bar No. 765214
ASHLEY REYNOLDS RAY
Georgia Bar No. 601559

*Counsel for the Debtor*